Joanne Marie EVANS, a minor, who sues here by her mother and next friend, Rose Marie Evans, and Roderick F. Evans, her father, who sues individually,

v.

UNITED STATES of America.

Civ. A. No. 60–647–F.

United States District Court
D. Massachusetts.

Dec. 10, 1962.

Jules E. Angoff, Boston, Mass., James L. Haley, Ayer, Mass., for plaintiff.

W. Arthur Garrity, Jr., U. S. Atty., Eugene X. Giroux, Asst. U. S. Atty., for defendant.

FRANCIS J. W. FORD, District Judge.

This is a suit under the Federal Tort Claims Act, U.S.C. Title 28, Section 1346 (b) for negligence in administering penicillin on October 1, 1958 into the body of a female infant. The complaint in paragraph five alleges the antibiotic was administered in the wrong part of the infant's buttocks, causing paralysis.

Before the trial the parties entered into the following stipulation:

"That if on or about October 1, 1958 a thirteen-month old female child being treated at the Patterson Army Hospital, at Fort Monmouth, in the State of New Jersey, was administered an injection of an antibiotic in her right buttock in such a manner that the injection caused injury to her sciatic nerve, such injection did constitute medical malpractice."

It is apparent from this uncommon stipulation that the usual question in malpractice cases involving alleged negligence as to whether a physician failed to possess and exercise the skill and care which members of the profession commonly possess and exercise in the community under corresponding circumstances is not present and the only question is: Was the injection administered in such a manner that it caused injury to the sciatic nerve of the child. If so, it is agreed it would constitute malpractice.

At the outset it is apparent that the question propounded is a medical problem and can only be resolved on the testimony of the experts as to the cause of the condition of Joanne Marie Evans and it is fundamental that the burden of proof is upon the plaintiffs. The testimony of the physicians who examined and operated upon the child is set out in considerable detail and the varying views disclosed, together with the testimony of the mother, Rose Marie Evans, as to the condition of the child both before and after the injection.

### THE FACTS

On October 1, 1958 Roderick F. Evans, a Sergeant in the United States Army and father of the plaintiff Joanne Marie Evans, a minor, was stationed at Fort

Monmouth in New Jersey. Joanne was born on September 2, 1957. On October 1, 1958 Joanne's mother found her cranky and running a temperature of 101° to 102° and she brought Joanne to the pediatric clinic at the Patterson Army Hospital at Fort Monmouth. There at about 3:30 P.M. the child was examined by a then Army pediatrician, one Dr. Robert G. Kerdasha. The child was found to be suffering from inflamed pharynx and tonsils, and with a temperature of 101°. The diagnosis was tonsillitis and pharyngitis and penicillin and bicillin, antibiotics, were prescribed. A shot of penicillin was administered by a nurse in each buttock according to the testimony of the child's mother. At 8:00 P.M. that evening the mother found the child crying in her crib; she attempted to stand the child up but the child "collapsed or buckled". The next day the child still had the temperature and would not stand up. The mother stated that this inclination not to stand up had not occurred before. The mother testified that the child did not stand up until supports were supplied some time later. Several other visits were made to the hospital. No treatment was prescribed for the child. The child's temperature was normal after a few days but there was a noticeable weakening in the right leg and a foot drop several days after the injection. Later at the hospital physiotherapy was prescribed. It continued for about a month. The child continued to favor her right leg. By November the child was moving around on the floor. Other doctors saw Joanne at the hospital in December and at that time a brace was suggested, which was first procured in January, 1959 and which she still wears.

Later in May, 1959 Mrs. Evans took the child to the Naval hospital in St. Albans to be seen by doctors there. At this time Joanne walked with a limp. Also, Mrs. Evans visited a private doctor —a Dr. Wylie at Little Silver, New Jersey and later visited the Naval hospital at St. Albans with the child.

In April of 1960 the mother consulted Dr. Heard at Fort Devens where the records from the Patterson hospital were sent. At this time her husband was stationed there. Dr. Heard made an examination and suggested that the child be taken to the Chelsea Naval Hospital. This hospital was visited twice, once in June and again in July, when there was talk of an exploratory operation. On the same day Mrs. Evans, with the child, saw Dr. Maxwell Macdonald—July 29—when another examination was made. At Dr. Macdonald's suggestion the mother saw a Dr. Matson at the Children's Medical Center in Boston. Dr. Matson made a further examination and referred the case to his associate Dr. John Shillito, Jr. for exploratory surgery, which will be described later. A Dr. Paul Griffin at the Children's Medical Center advised a change of brace, prescribed physiotherapy treatments and exercises.

At the present time the child, as stated, wears the brace on her right leg during the day, runs with a hop and walks with her right foot inward.

Dr. Maxwell Macdonald, a neurologist and psychiatrist, testified he examined Joanne on July 29, 1960 and did basically a neurological examination. On examination he found a very evident atrophy; the right leg was not developed as much as the left; there was a foot drop—the inability of bringing the right foot upwards which caused the child to drag the foot. There was absent a right ankle jerk and a sensory loss in the leg, and at time of the examination the child was wearing a brace to offset the foot drop. There was also some contraction of the muscles of the lower right leg. It was his opinion that the right sciatic nerve was involved in the injection given her on October 1, 1958. He explained the involvement as follows: "That the nerves which go to form the sciatic—there are several of them entering into the sciatic nerve—were adjacent to the injected penicillin which damaged the nerves chemically at the time of the injection" and the nerve roots of the fourth and fifth lumbar roots which enter the sciatic were the roots injured. The doctor later stated that there was a chemical action of the

nerves secondary to the penicillin material injected around the nerves.

Dr. Macdonald saw the child again on August 30, 1962 and found the whole right leg was smaller than the left and the child wore a brace at all times. He stated he did not know whether or not the needle penetrated the sciatic nerve, though the type of needle used, as introduced in evidence, could hardly have done so because it lacked length. He stated he found considerable atrophy and weakness in the muscles of the right lower leg and complete paralysis in the right peroneal group of muscles. Dr. Macdonald testified in his opinion a portion of the sciatic nerve was injured by the penicillin injection. He based his opinion chiefly on the fact that so far as the evidence disclosed the initial symptoms occurred shortly after the injection of the antibiotic, weakness in the lower right leg and no evidence of meningeal irritation or Kernig or inflammation of the nervous system found in polio or other infectious disease. The doctor also testified when he examined the child on July 29, 1960 there was a sensory diminution in the fourth and fifth lumbar roots which the doctor testified ruled out polio since there is no sensory involvement where only motor cells are affected, as in polio.

On cross examination Dr. MacDonald testified that since his graduation from medical school in 1921 the present case was the first case of its specific type that he had ever seen either of children or adults. He testified he had read of some. He testified he did no neurosurgery since World War II. Dr. Macdonald also testified he did not know what chemical effect of the penicillin injection caused the damage to the sciatic nerve. He stated: "I do not know the details. All I know is that it happened, practically." The doctor stated further that a "secondary chemical reaction which resulted in a degeneration of the nerves was a reasonable probability."

Dr. Macdonald also testified that at the point of the degeneration, if an operation were performed adjacent scarring of the nerve fibres would be found; that in all the cases he had read about where it was claimed an injection of an antibiotic had caused injury to the sciatic nerve there has been scarring. Dr. Macdonald stated that if an exploratory operation were performed above the sciatic notch, where, he testified, he believed the degeneration of the nerve roots took place, and no scarring were found he would have to change his opinion originally given that the injection caused the damage to the sciatic nerve. He testified the exploratory surgery which will be described later in this opinion, was not performed in the area above the sciatic notch where he believed the damage was done, but was performed in an area below the point where he believed the damage occurred to the sciatic nerve.

On September 9, 1960 Joanne Evans was operated upon by Dr. John Shillito at the Children's Medical Center of Boston, referred there by Dr. Macdonald for the purpose of performing a neurolysis to remove adhesions from the nerve, which Dr. Macdonald had concluded were present in the area he described as being degenerated. On admission the diagnosis was "Sciatic nerve neuropathy, presumably due to antibiotic injection." Dr. John Shillito is a neurosurgeon and currently on the staff of the Children's Medical Center in Boston. On examination before the operation on August 25, 1960 the doctor found a right foot which was turned in and could not be dorsiflexed, also hypalgesia over the dorsum of the foot and the doctor could palpate no mass along the sciatic nerve. Dr. Shillito could make no definitive diagnosis at this time or when he next saw her on September 6. The doctor stated that the purpose of his operation was to look for scar tissue in and around the sciatic nerve and if it were present to free the nerve from the scar or excise the part of the nerve that was scarred and resuturing it. The doctor stated that the basis for possible scarring was the fact that the history showed antibiotics had been injected. Dr. Shillito testified, as did Dr. Macdonald, that if the antibiotic damaged the sciatic nerve, definitely you would except to find

a scar which by contracting and becoming more dense at a later date could produce a weakness such as the child had. Dr. Shillito based this conclusion on his experience with several similar cases, in two of which he himself performed the operation, assisting in the others. He stated that in all other cases in the region he explored in Joanne's case where penicillin was injected and there was a neurological picture similar to this, he found a scar. Dr. Shillito in his operation explored the sciatic nerve from the upper third of the thigh posteriorly to the point where the sciatic nerve enters the greater sciatic notch, found the nerve somewhat atrophic but there was no scarring to the surrounding tissue and the nerve itself was not scarred, either intrinsically or extrinsically, but was quite soft and pliable. Dr. Shillito also testified that when he palpated the sciatic nerve there were no masses within the nerve itself which would indicate that there had been scarring within the nerve, and the nerve through its whole course was smaller in its girth than the normal sciatic nerve would be at the age of Joanne and the tissue when palpated was less than normal, which meant that the nerve was atrophied and it was atrophied through the whole distance of observation—from the mid-thigh up to a point two inches above the sciatic notch. Dr. Shillito testified that any antibiotic injection delivered in the region of the sciatic nerve over the area he explored would leave a very heavy scar, affixing the nerve to the surrounding tissues. Dr. Shillito also testified he looked beyond the sciatic notch and followed the course of the nerve into the pelvis for a distance of two inches. This was done by blunt dissection along the sciatic nerve (separating the tissues away from the nerve). Dr. Shillito testified there was no scar tissue in this area otherwise the dissection could not be possible with the ease with which this was done. Dr. Shillito stated that because the nerve cells, which are the cell body of the sciatic nerve, lie proximal to the area explored, in other words lie near or in the spinal canal, any damage to the nerve at a given level would be reflected by death or temporary destruction of the nerve fibres below that level. He also stated it was improbable that the type of needle used for the injection in the plaintiff's case could have entered the pelvis to a depth necessary to damage the nerve above the area explored, nor could a needle have entered the pelvis without scarring the adjacent tissues.

Dr. Shillito diagnosed the case of the child as one of sciatic nerve neuropathy and whatever injury occurred to the sciatic nerve must have occurred above the area explored and it was quite reasonable that the picture presented was caused by poliomyelitis, particularly inasmuch as his sensory examination revealed that the child did have sensation to pain over all the areas supplied by the involved nerves.

Dr. Walter Wegner, a neurosurgeon and clinical assistant professor at the Harvard Medical School, testifying for the plaintiffs, stated that in his opinion there was a causal relation between her present disability and the injection of October 1, 1958. He examined the child October 8, 1962, having in his possession the reports of Doctors Macdonald, Sweet and Watkins and a copy of the report of the Children's Medical Center. Dr. Wegner made an examination limited to the right leg. In substance he stated he based his conclusion upon the same grounds as Dr. Macdonald, relying heavily on the immediacy of the symptoms; and stated that a sensory loss would be incompatible with a finding of polio. Dr. Wegner testified that he had no previous experience with cases involving sciatic nerve injury due to antibiotic injection either in children or adults, nor had he read about any. The doctor stated further that he could not state the exact manner in which the sciatic nerve was injured by the antibiotic. Also, he testified that when injections such as are present here occur around the nerve and cause damage they usually cause it to be involved with a scar, but he testified he did not know that was invariably true.

He stated that an adequate sensory examination in a child of Joanne's age would be difficult. Also, he stated he never saw a patient with sciatic involvement from an injection of penicillin.

Dr. William H. Sweet, neurological surgeon, Chief of the Neurological Service at the Massachusetts General Hospital, and professor of neurosurgery at Harvard Medical School, was called by the defendant. He examined Joanne. Dr. Sweet found the same general physical condition as the other physicians and hospitals as to the difference in size of the right and left thigh and leg; also that the strength of the right lower limb was impaired not only in the distribution of the muscles supplied by the sciatic nerve but also by those supplied by the femoral nerve, the nerve that runs on the very front of the thigh. At the time of the examination Dr. Sweet had the reports of Dr. Macdonald, Army Hospital records and Dr. Shillito's. Dr. Sweet found the child had apparently good sensory distribution in response to stimuli. He found there was little, if any, involvement of the sensory component of the nerves. Dr. Sweet testified that the cause of her condition was attributable to a virus disease involving both the femoral and sciatic nerves and the cells of the nerves that give rise to impulses that make the muscles move.

Dr. Sweet also testified that the grossly diminuted right knee jerks that he found on examination would be completely inconsistent with any kind of involvement of the sciatic nerve; that the nerve which goes into action when the knee jerk is elicited is the femoral nerve and it was inconceivable that a needle put into the back of an individual could penetrate through the nerve that lies on the anteriormost aspect of the thigh. This same observation Dr. Sweet testified would apply to the right quadriceps muscle where he found a weakness. Dr. Sweet stated that a disorder that caused affliction of both the femoral and sciatic nerves was more likely an explanation of the child's symptoms and findings than an hypothesis that afflicted only one of these nerves—the sciatic nerve. Dr. Sweet stated a common cause of an abrupt onset of weakness as has occurred in this case is some virus disease affecting the motor cells, the commonest of these being poliomyelitis which he testified begins with fever and sore throat and some hours to a day or so later an abrupt onset of muscle weakness.

## OPINION

Have the plaintiffs proved by a fair preponderance of the evidence that the injection of the penicillin caused the injury to Joanne?

The chief factor that convinces me they have not sustained their burden of proof in this case may be found in the testimony of Dr. John Shillito. He was the only neurologist that testified in this case that had any experience in exploratory surgery in this type of case. He had assisted at several similar operations and actually performed two himself. He testified, as did Dr. Macdonald and Dr. Wegner, that if the antibiotic damaged the sciatic nerve definitely you would expect to find the scarring of the nerve on exploratory surgery. Dr. Shillito, as stated above, testified that where the neurological picture was similar to the one in the instant case a scar would be found in the region he explored in Joanne's case. In Joanne's case there was no scarring in the surrounding tissue or the nerve itself in the area of exploration. The latter he found soft and pliable. To support plaintiff's theory that an antibiotic injection could cause damage to the sciatic nerve, counsel for plaintiff introduced in evidence a copy of the Journal of American Medical Association dated July 23, 1960. The article was captioned "Sciatic Nerve Injury in Infants". It revealed that sciatic neuropathy has occurred after intraglutial injections and in three most recent cases that were explored surgically the neuropathology involved the sciatic nerve in the buttocks. In each of the cases there was found marked scarring in and about the sciatic nerve and notch, a significant fact. It was further stated in the article: "Surgery in our

and others' series has invariably disclosed scarring about the sciatic nerve."

Dr. Macdonald, as stated above, testified that the area above the sciatic notch was not explored, that if it were he believed scarring would be found. This appears to be mere conjecture. As a matter of fact, Dr. Shillito testified, as appears above, that he looked beyond the sciatic notch and followed the course of the nerves into the pelvis for a distance of two inches and he found no scarring.

It should be pointed out that there was considerable discussion in this case as to whether the child had a sensory loss or diminution which would be incompatible with polio. From the evidence in the light of the divergent testimony of the doctors and the difficulty of determining this factor in a child, I cannot find as a fact there was any firm evidence in this direction from which an ultimate conclusion was warranted there was such and it resulted from the injection. In fact, Dr. Shillito testified in the sensory examination he made the child did have sensation to pain. It should be stated that Drs. Shillito and Sweet would not rule out polio while asserting that in their opinion Joanne was suffering from some kind of virus infection that affected the motor cells, the most common of which was polio.

As with all cases where the solution of the problem depends solely on medical opinion the court looks not only to the factual evidence but is compelled to place great reliance on the training and experience of the physicians who testify. The only physician who had any actual experience with the type of medical problem involved here was Dr. John Shillito of the Children's Hospital Medical Center. Also, here the court was greatly impressed by the testimony of Dr. Sweet. From their testimony, which was of far more persuasive force than the testimony of the experts for the plaintiffs and especially from the factual findings of Dr. Shillito in the exploratory operation, I find and conclude as follows:

## CONCLUSIONS

■ (1) The Plaintiffs have failed to sustain their burden of proof that the injection of penicillin given the minor Plaintiff on October 1, 1958 was given in such a manner that it caused injury to Joanne.

(2) That the evidence adduced points more probably to the conclusion that the physical condition of the minor Plaintiff is due to a viral infection.

Judgment will be entered for the defendant.