Joanne Marie **EVANS**, Etc., et al.,
Plaintiffs, Appellants,

v.

**UNITED STATES** of America,
Defendant, Appellee.

No. 6109.

United States Court of Appeals
First Circuit.

July 2, 1963.

Jules E. Angoff, Boston, Mass., James L. Haley, Ayer, Mass., and Walter J. Hurley, Boston, Mass., on the brief, for appellants.

Eugene X. Giroux, Asst. U. S. Atty., W. Arthur Garrity, Jr., U. S. Atty., on the brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the District of Massachusetts in favor of the defendant in an action brought under the Federal Tort Claims Act, 28 U.S.C. §

1346(b), et seq., for injuries allegedly sustained by a female infant as an aftermath of an antibiotic injection which she received while being treated in a United States Army hospital.

Plaintiff—Joanne Marie Evans—the daughter of a United States Army sergeant, was thirteen months old at the time of the event which gave rise to the instant action.[1] On October 1, 1958, finding the child to be cranky and running a temperature of 101° to 102°, her mother brought her to the pediatric clinic at the Patterson Army Hospital at Fort Monmouth, New Jersey. After an examination, the child was found to have an inflamed pharynx and tonsils and a temperature of 101°. The diagnosis was tonsillitis and pharyngitis and antibiotics were prescribed. Shortly thereafter a shot of penicillin was administered by a nurse in each buttock according to the testimony of the child's mother. What thereafter transpired is accurately reflected in the following statement from the opinion of the trial judge:

"At 8:00 P.M. that evening the mother found the child crying in her crib; she attempted to stand the child up but the child 'collapsed or buckled'. The next day the child still had the temperature and would not stand up. The mother stated that this inclination not to stand up had not occurred before. The mother testified that the child did not stand up until supports were supplied some time later. Several other visits were made to the hospital. No treatment was prescribed for the child. The child's temperature was normal after a few days but there was a noticeable weakening in the right leg and a foot drop several days after the injection. Later at the hospital physiotherapy was prescribed. It continued for about a month. The child continued to favor her right leg. By November the child was moving around on the floor.

Other doctors saw Joanne at the hospital in December and at that time a brace was suggested, which was first procured in January, 1959 and which she still wears." Evans v. United States, 212 F.Supp. 648, 649 (D.C. Mass.1962).

From January 1959 through September 12, 1960—the date on which the complaint was filed in the district court—and thereafter, the child underwent extensive medical treatment for her leg. The chronology of these treatments is recounted at length in the opinion of the district court and need not be repeated here.

From the outset, it has been plaintiffs' contention that the unfortunate condition of Joanne's leg was caused by the negligent manner in which the antibiotics were injected by an army nurse at the army hospital. Specifically, it is plaintiffs' theory that the injection caused serious sciatic nerve injury to the child. The United States—on the other hand—has consistently denied a causal connection between the October 1, 1958 penicillin injection and the paralysis which, shortly thereafter, manifested itself.

Prior to the trial, the parties entered into the following stipulation: "That if on or about October 1, 1958 a thirteen month old female child being treated at the Patterson Army Hospital, at Fort Monmouth, in the State of New Jersey, was administered an injection of an antibiotic in her right buttock in such a manner that the injection caused injury to her sciatic nerve, such injection did constitute medical malpractice."

In the light of this stipulation the only factual issue before the trial judge was whether the injection of penicillin was causally connected with Joanne's injury. The district judge ruled that the plaintiff failed to prove by a fair preponderance of the evidence that the injection of the penicillin caused the injury. The correctness of this ruling is the sole issue here on appeal.

1. The instant action was brought by the child's mother who sued in a representa-
tive capacity and by her father who sued individually.

With the case in this posture the findings of the trial judge come to us with "the buckler and shield", McGowan v. United States, 296 F.2d 252, 254 (5th Cir., 1961), of the Federal Rules of Civil Procedure which provide that findings of fact by a trial court "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." F.R.Civ.P. 52(a), 28 U.S.C.; D'Orsay Equipment Co. v. United States Rubber Company, 302 F.2d 777, 778 (1st Cir., 1962); A. Belanger & Sons, Inc. v. United States, 275 F.2d 372, 375 (1st Cir., 1960). It is settled that an appellate court has no power to disturb a finding of fact of a trial court where it is based on some substantial though conflicting evidence. Jue v. Bass, 299 F. 2d 374, 377 (9th Cir., 1962). An appellate court, in determining the presence or absence of substantial evidence, is not required to reweigh the evidence adduced in the trial court but need only scrutinize the record to ascertain if it affords some reasonable basis for the result achieved. Lattig v. Pilliod, 289 F.2d 478 (7th Cir., 1961).

"It is not our function to hold a trial de novo in which the whole controversy begins anew and in which every disputed factual controversy and every possible inference is earnestly debated, measured, evaluated and tallied only to reach for the next disputed factual issue to inventory in like fashion." Travelers Insurance Company v. Truitt, 280 F. 2d 784, 788 (5th Cir., 1960).

In sum, we are not to substitute our judgment for that of the trial court, Homestake Mining Co. v. Mid-Continent Exploration Co., 282 F.2d 787, 796 (10th Cir., 1960), but may reverse only where, upon a consideration of the entire evidence, we are "left with a definite and firm conviction that a mistake has been committed." McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20 (1954).

Notwithstanding the conspicuously sympathetic overtones of this unfortunate case, upon a careful review of the entire record, we are not left with such a definite and firm conviction that a mistake has been made by the trial court.

The evidence adduced at trial consisted of the testimony of Dr. Maxwell Macdonald, a neurologist and psychiatrist and Dr. Walter Wegner, a neurosurgeon and clinical assistant professor at the Harvard Medical School, who testified for the plaintiffs; Dr. John Shillito, a neurosurgeon on the staff of the Children's Medical Center in Boston; Dr. William H. Sweet, neurological surgeon, Chief of the Neurological Service at the Massachusetts General Hospital and professor of neurosurgery at Harvard Medical School, and Dr. Robert Kerdasha, a pediatrician, were called by the defendant. In addition, plaintiffs introduced documentary evidence consisting of pertinent medical records and examinations relating to Joanne.

A significant facet of the evidence at the trial—on the question of causal nexus —was whether Joanne's condition manifested symptoms or indicia consistent with other cases of clinically established antibiotic damage to the sciatic nerve. The record indicates that one of the prime indicia of antibiotic-induced disability is the presence of scarring in and about the region of the sciatic nerve. The trial judge attached great significance to the record testimony as to this point—particularly as developed by Dr. Shillito—the only doctor testifying at the trial who had performed exploratory surgery on the child. This emphasis is reflected in the following language of the trial judge:

"The chief factor that convinces me [plaintiffs] have not sustained their burden of proof in this case may be found in the testimony of Dr. John Shillito. He was the only neurologist that testified in this case that had any experience in exploratory surgery in this type of case. He had assisted at several similar operations and actually performed two himself. He testified, as did Dr. Macdonald and Dr. Wegner, that

if the antibiotic damaged the sciatic nerve definitely you would expect to find the scarring of the nerve on exploratory surgery. Dr. Shillito, as stated above, testified that where the neurological picture was similar to the one in the instant case a scar would be found in the region he explored in Joanne's case. In Joanne's case there was no scarring in the surrounding tissue or the nerve itself in the area of exploration. The latter he found soft and pliable. To support plaintiff's theory that an antibiotic injection could cause damage to the sciatic nerve, counsel for plaintiff introduced in evidence a copy of the Journal of American Medical Association dated July 23, 1960. The article was captioned 'Sciatic Nerve Injury in Infants'. It revealed that sciatic neuropathy has occurred after intraglutial injections and in three most recent cases that were explored surgically the neuropathy involved the sciatic nerve in the buttocks. In each of the cases there was found marked scarring in and about the sciatic nerve and notch, a significant fact. It was further stated in the article: 'Surgery in our and others' series has invariably disclosed scarring about the sciatic nerve.'" 212 F. Supp. at 652.

Plaintiffs argue here that the trial judge misconceived the fair import of the testimony of Dr. Shillito on the scarring feature of the case. It is their position that the absence of scarring in the region which Dr. Shillito explored should only lead to the conclusion that he did not probe in the appropriate region —that is to say that the injection and any residual scarring must have occurred in a portion of Joanne's anatomy above the exploratory surgery of Dr. Shillito.

We disagree. Dr. Shillito was explicit that in the other operations in which he personally participated—where there was sciatic nerve injury, where the antibiotic injected had been penicillin and where the neurological symptoms were similar to those of Joanne—exploratory surgery revealed scarring in the very region in which he performed the surgery in the instant case. Moreover, apropos of plaintiffs' contention that scarring probably existed above the area explored, Dr. Shillito testified that he looked beyond the sciatic notch (the terminal point of the exploratory surgery) and observed the course of the nerves leading into the pelvis for a distance of two inches and found no scarring. Finally, in addition to the visual observations thus recounted, Dr. Shillito also testified that in palpating the nerve with his fingers, he was able to ascertain that there were no masses within the nerve itself which—to him— eliminated the possibility of internal scarring within the nerve itself—an hypothesis raised by plaintiffs.

Dr. William Sweet's testimony also indicated that Joanne's disability was inconsistent with an antibiotic-induced injection. Initially he noted that his examination disclosed that Joanne had a grossly diminished knee jerk on the right leg and an absent ankle jerk. He stated that this condition would be completely inconsistent with any kind of involvement of the sciatic nerve because of the anatomical posture of the relevant nerves. Relative to the weakness in Joanne's right quadriceps muscles, Dr. Sweet stated, that similarly, such a weakness would not be consonant with a sciatic nerve injury since this is one of the main muscle groups "which is innervated exclusively by the femoral nerve and not at all by the sciatic nerve." Finally, he noted that the abrupt collapse or "buckling" of Joanne's leg on the day which she received the penicillin—and her subsequent inability to walk—were antithetical to a diagnosis of sciatic nerve involvement. This testimony came at the end of an extremely comprehensive hypothetical question put to him by plaintiffs' counsel during cross-examination which elicited the following response:

"Your Honor, I am glad to have this additional information because I wasn't aware of the character of the weakness, certainly involving

them, at least the muscles that set the thigh on the right limb, if the child crumbled. It is a striking fact that when only the sciatic nerve is involved the individual stands on the leg well and this inclines me, then, with more confidence, your Honor, to think that at this time the child had indeed had an abrupt weakness in both of these muscles in the front of the thigh as well as those supplied by the sciatic nerve, and it is a rather striking intonation that the child did indeed have an extensive involvement of the muscles, much more consistent with some kind of virus disease, than the injection of a single needle. I base this on seeing, for example—hearing directly from soldiers their accounts following gunshot wounds of the sciatic nerve where there is indeed an extremely abrupt paralysis of all the muscles concerned as well as elements of all the sensation, and they are able to set the limb, stand on it well.

"XQ. Haven't you known of cases with injections, chemical injections, and followed in immediacy by onsets of trouble of this kind such as this child is having? A. The one patient who was up and about whom I can be reasonably certain had this kind of injection, namely into the sciatic nerve, was able to walk right away. This didn't interfere with the walking. This was rather a striking feature of the difference of involvement only of the sciatic nerve and of the sciatic and the femoral nerves."

Finally, another question which received considerable attention at the trial was whether or not Joanne's disability was accompanied by any sensory loss or diminution. If the child suffered any such loss, the record indicates that this factor would militate against the possibility of polio as a cause of Joanne's condition. The trial judge ruled that the evidence on this point was so equivocal that he could not find as a fact there was a sensory diminution. Our appraisal of the record confirms the trial judge's conclusion in this regard.

In the final analysis, we believe that this case can best be summarized in the concluding words of the trial judge's opinion:

"As with all cases where the solution of the problem depends solely on medical opinion the court looks not only to the factual evidence but is compelled to place great reliance on the training and experience of the physicians who testify. The only physician who had any actual experience with the type of medical problem involved here was Dr. John Shillito of the Children's Hospital Medical Center. Also, here the court was greatly impressed by the testimony of Dr. Sweet. From their testimony, which was of far more persuasive force than the testimony of the experts for the plaintiffs and especially from the factual findings of Dr. Shillito in the exploratory operation, I find [for the defendant]: * * *." 212 F.Supp. at 653.

To be sure, the testimony in this case—both oral and documentary—abounded in conflicting and divergent hypotheses from which competing inferences might well be drawn. However, it is the very essence of the trial court's function to choose from among the competing and conflicting inferences and conclusions that which it deems most reasonable. Cf., Roche v. New Hampshire Nat. Bank, 192 F.2d 203, 205 (1st Cir., 1951). Where, as here, the question turns largely on the testimony of experts, the trial court has the right to decide which set of experts—plaintiff's or defendant's—will be credited. Dufrene v. Indemnity Insurance Co. of North America, 303 F.2d 788 (5th Cir., 1962). Relative to the conspicuous weight which the court below attached to the testimony of Dr. Shillito, it is settled that a trial court has the privilege to rest its judgment on a single expert despite conflicting evidence to the contrary. Caddy-Imler Creations, Inc. v.

Caddy, 299 F.2d 79 (9th Cir., 1962). So long as there appears some reasonable and discernible basis for the result achieved—which plainly exists in the instant case—the trial court's finding must stand.

For the foregoing reasons, we believe that the finding of the trial court that the plaintiffs have failed to sustain their burden of proof that the injection of penicillin caused injury to Joanne is supported by substantial evidence and should be affirmed.

Judgment will be entered affirming the judgment of the district court.