**PRECON, INC., Plaintiff/Appellee,**

v.

**JRS REALTY TRUST,
Defendant/Appellant.**

**Civ. No. 84–0085–P.**

United States District Court,
D. Maine.

Feb. 28, 1985.

---

U. Charles Remmel, II, Kelly, Remmel & Zimmerman, Portland, Me., for plaintiff/appellee.

Walter R. May, Jr., Peabody & Arnold, Boston, Mass., Jeffrey T. Edwards, Preti, Flaherty & Beliveau, Peter Greanleaf, U.S. Trustee, Portland, Me., for defendant/appellant.

## OPINION

GENE CARTER, District Judge.

Appellant, Precon, Inc., was a Chapter 11 Debtor which brought an action against Appellee, JRS Realty Trust, to recover the balance due on a contract. JRS is the owner of a building housing the Spencer Press printing facility in Wells, Maine, which was constructed in 1980 and 1981. Precon was engaged by JRS to supply insulated precast concrete panels that form the exterior skin of the building. At trial, the parties disagreed as to the terms of their agreement. The bankruptcy court found, and it is not disputed on this appeal, that the relationship between the parties was governed by a contract signed by both parties on September 26, 1980. After deducting certain amounts for nonconformities in Precon's performance and for outstanding mechanic's liens filed against the project, the bankruptcy court ordered judgment in favor of Precon in the amount of $75,-622.06 plus interest and costs. JRS has appealed the judgment.[1]

JRS argues on appeal that the bankruptcy court erred in awarding Precon damages on the contract on the basis that Precon did not substantially perform under the contract and the question of recovery in *quantum meruit* was neither pleaded nor tried. Second, JRS contends that the bankruptcy court erred in calculating the amount of damages for which Precon was responsible due to nonconformities in Precon's performance. Third, JRS claims that the bankruptcy court erred in dismissing its counterclaims for deceit and abuse of process.

JRS' assignments of error are directed primarily at the findings of fact by the bankruptcy court. On appeal from the bankruptcy court, "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed.R.

---

**1.** The tortuous procedural history of this appeal, which is not immediately relevant to this decision on the merits of the appeal, is set forth in Opinion and Order, Carter, J., January 4, 1985. 45 B.R. 847. In that opinion, this Court determined that it has jurisdiction to decide this appeal. There is no question here as to the validity of the bankruptcy court's judgment under *Northern Pipeline Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), because the bankruptcy court decided the *Precon* case during the pendency of the Supreme Court's stay of the judgment in *Northern Pipeline. Id.*, 458 U.S. at 52, n. 1, and 73–74, 102 S.Ct. at 2862, n. 1, and 2873–2874.

Bankr.P. 8013. A finding of fact is clearly erroneous when it is against the clear weight of the evidence. *Holmes v. Bateson,* 583 F.2d 542, 552 (1st Cir.1978). A finding will be found erroneous and require reversal only if the court is left with the definitive and firm conviction that a mistake has been committed. *Id.; Evans v. United States,* 319 F.2d 751, 753 (1st Cir. 1963).

A careful review of the nine volumes of transcripts of trial testimony and the many exhibits contained in this record discloses that factual determinations in this case depend upon a thorough understanding of many technical aspects of the construction of the Spencer Press printing facility. The bankruptcy judge created a complete record for purposes of appeal. A court conducting an appellate review of such a record is at a recognized disadvantage, however, in comparison to the trial judge in examining the evidence and assigning weight to its various parts. The trial judge had the benefit of direct observation of witnesses' explanations of and physical references to drawings and other exhibits, a personal view of the job site, and personal observation of the demeanor of witnesses to aid his understanding of the evidence. Thus, this Court's duty not to disturb findings of fact by the trial court unless clearly erroneous weighs especially heavily in this case.

## I. *Substantial Performance*

JRS argues at length that the bankruptcy court should not have permitted Precon to recover in *quantum meruit* since the theory was not pleaded or tried. This question need not be reached, however, if the bankruptcy court correctly found that Precon substantially performed its obligations under the contract.

In its Memorandum Decision, the bankruptcy court did not expressly state the theory it adopted in support of Precon's recovery. The bankruptcy court stated quite explicitly, however, that "the proceeding is governed by the contract of September 26, 1980." The bankruptcy court then proceeded to deduct from the balance due on the contract amounts attributable to defects in Precon's performance. Precon was to receive a total of $369,558 under the contract. The bankruptcy court deducted a total of approximately $51,000 from this amount for nonconforming work by Precon.

If a party to a construction contract endeavors in good faith to perform and does substantially perform an agreement, he is entitled to recover the contract price, less any amounts attributable to imperfections in his performance under the contract. *Hattin v. Chase,* 88 Me. 237, 240, 33 A. 989 (1895); *see also, Lawrence v. Cunningham,* 160 Me. 89, 92–93, 197 A.2d 767 (1964). The critical issue with respect to substantial performance of construction projects is whether the owner obtains that which is necessary to accomplish the purposes of the contract. *Klug & Smith Co. v. Sommer,* 265 N.W.2d 269, 272, 83 Wis. 378 (1978); 13 Am.Jur.2d, *Building and Construction Contracts,* § 43 (1964). The defects must not be so serious as to deprive the property of its value for its intended use; the deduction of damages for defects from the contract price must provide fair compensation. *Dittmer v. Nokleberg,* 219 N.W.2d 201 (N.D.1974). The question whether a party has substantially performed a contract is to be decided by the trier of fact. *Edens v. Kole Construction Co.,* 450 A.2d 1161, 1164, 188 Conn. 489 (1982); *Dittmer,* 219 N.W.2d at 201.

The contract in this case describes "the work" to be performed by Precon as "the production of delivery to and storage at the project of all precast concrete." This description was elaborated upon in several documents incorporated into the contract by reference. The bankruptcy court found that Precon's performance was nonconforming in several respects. It found that Precon was delinquent in producing and submitting shop drawings for approval, and that the lack of adequate shop drawings was in part responsible for misplaced hardware imbedded in the concrete panels and panels which exceeded tolerances prescribed by the manual for quality control.

It also found that there were defects in the exterior surface appearance of the panels and that Precon had failed to seal all the panels as required by their agreement.

The extensive record in this case amply supports these findings. The Court's finding that each of these instances of nonconforming performance were compensable in damages was also amply supported by the evidence. Despite these defects in performance, there was no evidence indicating that Precon failed to fulfill its primary obligation under the contract, that is, to produce and deliver all precast concrete for the project. Nor is there any evidence of record indicating that the precast panels provided by Precon have failed to serve their intended purpose. Finally, there is no evidence that Precon did not in good faith endeavor to perform its obligations under the contract. Therefore, the finding, implicit in the bankruptcy court's Memorandum Decision, that Precon had substantially performed under the contract is not clearly erroneous.

## II. *Calculation of Damages*

JRS quarrels with several of the bankruptcy court's findings with respect to damages caused by defects in Precon's performance under the contract. A brief review of the factual background is essential to an understanding of the damage issues raised by JRS.

The principals in this case each had the understanding that construction of the Spencer Press printing facility was to be a "fast-track job." In other words, normal procedures for bidding, awarding contracts, design and planning were deliberately accelerated with the aim that the facility might be fully enclosed before the winter of 1980–81. Precon first heard about the job in May of 1980. Dana Turner, one of the two stockholders in Precon, was told on or before June 7, 1980, that Precon had been awarded the contract for production of precast concrete panels. However, Precon's formal bid was not submitted until July 14, 1980. JRS subsequently notified Precon to begin work on the project. The contract which governed the relationship between Precon and JRS was not signed until September 26, 1980, more than a month after Precon delivered the first panel to the job. The contract provided that Precon's work should be substantially completed by October 22, 1980. Precon did not cast the final panel, however, until December 1, 1980.

In addition to Precon, several other contractors signed direct contracts with JRS, the owner. JRS also entered a general contract with Rocca Construction, who in turn employed numerous subcontractors to do much of the work on the job. Initial design of the facility was done by Enertech, a Chicago engineering firm. JRS also employed on an hourly basis, as structural engineer, Signal Engineering, also of Chicago. James Somes, an architect who initially was a member of the firm of Wright Pierce Associates, and who later formed his own firm, JAS Associates of Portsmouth, New Hampshire, was employed to oversee certain aspects of the project. The architect was also paid on an hourly basis.

The record indicates that a number of problems that had some relationship to production and erection of the precast concrete panels arose on the job site. JRS here challenges several findings related to allocation of responsibility for those problems.

### A. *Coordination of the Work*

First, JRS contends that the bankruptcy court's finding that many of the problems that occurred could have been anticipated and solved by a competent and experienced project manager was clearly erroneous. This finding was the basis of the bankruptcy court's allocation of responsibility for "back charges" submitted between September 24, 1980, and October 9, 1980, and its refusal to award JRS damages for the cost of temporary heat and extra charges by architects and engineers.

The record indicates that the architect, James Somes, did not consider himself to be filling the role of construction manager, whose job it would be to coordinate the work among the various contractors.

Somes also testified that the staff of Rocca Construction, the general contractor, was not qualified to manage the whole job. He observed that Rocca had problems coordinating its own work with the other trades. Somes testified that he several times recommended to the owner's representative, John Spenlinhauer, that he hire a full-time construction manager. Spenlinhauer initially ignored Somes' advice, apparently to save money. Somes told the owner that it was "imperative" to have a construction manager when the steel frame of the building was erected. However, the steel was erected without any supervisor representing the owner. Finally, on October 24, the owner employed a John Cogswell, a printing machine designer, to act as his on-site representative. Somes told Spenlinhauer that Cogswell was not qualified to perform the job. An experienced, full-time construction manager was finally hired by Spenlinhauer, on or near Thanksgiving, 1980, to attend on the job.

JRS argues that there is no evidence that the absence of a full-time supervisor in any way affected Precon's performance. This Court's review of the record indicates there is ample evidence to support the bankruptcy court's finding. In particular, there was a great deal of confusion and uncertainty concerning the manner in which panels constructed by Precon were to be connected to the steel frame of the building. There was evidence indicating that the erector, Maurice Luckern, was uncertain about how the panels should be connected to the steel. It was clear that the architectural drawings provided to the contractors did not indicate the details of how the connections were to be made. In order to design the connection hardware which would be imbedded in the concrete panels, Precon had to obtain information about the dimensions and location of the steel beams to which they would be attached. There was testimony to the effect that the shop drawings provided by the steel fabricator came in well behind schedule, and that these drawings were needed by Precon in order to create the drawings with respect to the concrete panels. There was also testimony that the size of several steel beams was altered without notice to Precon, which affected the design of Precon's connections. In addition, at least one steel beam was deleted.

In one instance, on the so-called "R–Line," Precon was asked to recast some panels because the connection design was altered by an engineer by the name of Harbarge. This connection apparently caused the steel beam on the R–Line to deflect, and Edward Roehm, the structural engineer from Signal Engineering, ordered the erector to "burn off" the connections.

There was testimony that there were variations in the sizes of the panels which caused problems in their erection. Gerald Kriegel, a precast concrete erector by trade who testified as an expert on behalf of Precon, testified, however, that precast concrete panels routinely vary in height and width, and that an erector should lay out a plan for erection of all the panels in advance in order to compensate for these variations. Kriegel also testified that, as an erector, he would be very much involved in the design of the connections. The testimony indicated that the erector at the Spencer Press project, Luckern, wanted nothing to do with the design of the connections.

Turner testified that the connection problems were caused by the vagueness of the initial architectural drawings. On the other hand, architect Somes testified that it was not intended that the architectural drawings should set forth the connection details. Turner also testified that he called the steel fabricator in order obtain the steel elevations, and that he relied on the information provided by the fabricator. He stated that he later received drawings showing that the beams had been changed, which threw off the location of the connection hardware on the precast concrete panels.

The clear impression left from these facts is that there was confusion among the precast contractor, the erector, the steel fabricator, and the architect with respect to communication between and coor-

**438**

dination among those trades. The evidence would support a finding that, had the coordination been better, some of the problems arising in respect to design of the precast connections and erection of the panels could have been avoided. Thus, there is substantial evidence to support the bankruptcy court's finding that had someone been firmly in charge of coordinating and supervising these trades, some of the problems might have been avoided. The bankruptcy court's finding that many of the problems could have been anticipated and solved by a competent and experienced project manager was not clearly erroneous.

### B. *"R-Line" Damages*

■ The bankruptcy court also found that structural defects with the "R-Line" was an "engineering problem not caused by Precon." JRS argues that this finding was clearly erroneous. John Cogswell, an employee of JRS, testified that Precon had been asked to recast some panels because the connection on the "R-Line" had been changed. Ed Roehm, the structural engineer for JRS, testified that the "R-Line" beam rolled or deflected because the steel fabricator had not furnished a flange connection. Gerald Kriegel, the expert for Precon, testified that the deflection of steel on which the precast concrete is hung is not the responsibility of the precast supplier. This and other testimony supports the bankruptcy court's finding that structural problems with the "R-Line" were not caused by Precon. Accordingly, the bankruptcy court's finding was not clearly erroneous.

### C. *Extra Charges for Architects and Engineers*

■ The bankruptcy court refused to award JRS damages for extra charges for architects and engineers resulting from problems allegedly caused by Precon. Again, the bankruptcy court found that these charges could have been avoided if those professionals had been on the job on a regular basis. Enough testimony has been reviewed here to indicate that there were difficulties on the job arising from the lack of proper coordination and the speed with which the owner attempted to complete the project. Under these circumstances, this Court cannot agree that the bankruptcy court's finding that more vigilant supervision by architects and engineers would have helped to avoid extra charges is clearly erroneous.

### D. *Transportation Expenses*

■ Precon was required under the contract to transport concrete panels to the job site. JRS introduced evidence at trial that it had paid Merrill Transport the amount of $1,757 for transportation. JRS contends that the bankruptcy court's failure to order Precon to pay this amount to JRS was clear error. However, the evidence also indicated that the transportation bill for $1,757 in part reflected charges for movement of panels on the job site, for which Precon was not responsible. JRS failed to introduce any evidence indicating which portion of the bill was properly allocable to Precon, and, therefore, failed to meet its burden of proof with respect to damages for transportation costs. Accordingly, the bankruptcy court's failure to award JRS damages for transportation costs was not clearly erroneous.

### E. *Liquidated Damages*

■ JRS argues that the bankruptcy court erred by failing to award JRS liquidated damages, in accordance with a provision of the contract, in the amount of $500 for each day beyond the date of substantial completion set forth in the contract. Under Maine law, the party seeking an award of liquidated damages has the burden of proving (1) that the amount of actual damages was difficult to forecast; and (2) that there was some reasonable relationship between the amount of damage fixed and that likely to be suffered. *Dairy Farm Leasing Co., Inc. v. Hartley,* 395 A.2d 1135, 1139 (Me.1978). An award of liquidated damages in this case would have been improper for several reasons.

First, JRS did not include a claim to enforce the liquidated damage provision in

its answer and counterclaim. Nor did JRS raise the issue in any other pleading, memorandum of law or oral argument included in this record on appeal. Accordingly, by failing to raise the issue below, JRS has waived the right to claim error in this appeal. *See J&S Construction Co., Inc. v. Travelers Indemnity Company,* 520 F.2d 809 (1st Cir.1975).

Assuming that the claim for liquidated damages was properly raised in the bankruptcy court, it is clear that such an award would have been improper in this case. Assuming, for the purpose of resolving this issue, that Precon failed to meet its contractual deadline for supplying the panels and that this failure was entirely Precon's fault, JRS still did not produce evidence supporting recovery under the test of *Dairy Farm Leasing.* First, there is no evidence in the record tending to show that the amount of actual damages as a result of delay was difficult to forecast. Second, JRS offered no evidence indicating that there was a reasonable relationship between the amount of damage fixed and that likely to be suffered. Therefore, JRS has failed entirely to meet its burden of proof under the *Dairy Farm Leasing* test.

JRS did produce extensive evidence regarding *actual* damages caused by Precon's delays and other defects in performance. JRS was awarded such actual damages in the amount of approximately $51,-000. The record does not show that there were any damages attributable to Precon's delays above and beyond the actual damages which the Court found JRS to have suffered. Accordingly, this Court finds no error in the bankruptcy court's failure to enforce the liquidated damages provision of the contract.

### III. *Deceit and Abuse of Process*

#### A. *Deceit*

JRS included in its counterclaim a claim for deceit. JRS contends that Precon filed under Chapter XI of the Bankruptcy Code on July 22, 1980, and that Precon failed to disclose this filing to JRS. JRS argues that this failure of disclosure was a material misrepresentation upon which it relied to its detriment in entering the contract with Precon.

The elements for an action for deceit are set forth in *Horner v. Flynn,* 334 A.2d 194 (Me.1975):

(1) A material representation which is (2) false and (3) known to be false, or made recklessly as an assertion of fact without knowledge of its truth or falsity; (4) made with the intention that it shall be acted upon and (5) acted upon with damage; that (6) plaintiff relied upon the representations, (7) was induced to act upon them, and (8) did not know them to be false, and by the exercise of reasonable care could not have ascertained their falsity.

*Id.* at 203.

The crux of JRS' theory is that Precon's Chapter XI filing indicated that Precon knew it was in poor financial condition to perform the contract.

The evidence in this case demonstrates that JRS failed to prove several of the critical elements of an action for deceit. First, there is no evidence that JRS made any inquiry whatsoever into Precon's financial condition prior to entering the contract. Thus, there is no evidence indicating that JRS exercised reasonable care to ascertain the financial condition of Precon. Second, JRS failed to show that the fact that Precon filed under Chapter XI was indeed a material fact; there is no evidence that the Chapter XI filing affected Precon's ability to perform. Third, there is no evidence of record that Precon's alleged financial difficulties and Chapter XI filing in any sense caused damage to JRS. It is true that JRS was able to prove a number of defects in Precon's performance, but the evidence does not support any causal connection between these defects and Precon's financial condition. Thus, the bankruptcy court correctly dismissed the counterclaim for deceit.

#### B. *Abuse of Process*

Precon sued JRS' trustee, John Spenlinhauer, personally in its amended complaint.

JRS argues that the only purpose of suing Spenlinhauer personally was to "forestall the pending Chapter XI proceedings by portraying itself to the bankruptcy court and awaiting creditors as an innocent participant in a situation which was not of its own making." JRS argues that this constitutes abuse of process.

The evidence produced by JRS in support of its abuse of process counterclaim consists in its entirety of the following excerpt from the direct testimony of Spenlinhauer:

> So after I got back—I think we had been at a meeting at the job site, as a matter of fact, and I asked Dana, I said, "What are you guys doing suing me for a half million dollars?" And Dana says, "I don't know. Just probably trying to keep you moving or harass you." I won't say specifically those were the words he used, but words to that effect. And I said, "Have you instituted suit when we haven't really even tried to settle this thing," and he said, "I guess that was obviously Chuck trying to keep the Bankruptcy Court—" how to put the right words together, but to keep the Court at bay, I guess, because they have got this case going and I guess,—and I don't know a whole lot about the petition in Bankruptcy, but I understand that was supposed to be coming through in and around that time frame, and this was part of the legal tactics that they use to keep the Court at bay or maybe I am not using the right words here.

7 Tr. at 136.

In his testimony, Dana Turner denied that he said anything to Spenlinhauer about keeping the bankruptcy court at bay; Turner testified that he told Spenlinhauer that the reason he was sued was that he was one of the owners of JRS and was the individual with whom Precon had had all its dealings.

■ The vague recollections of John Spenlinhauer alone are hardly sufficient to sustain a cause of action for abuse of process. Assuming that they are, they were clearly rebutted by the testimony of Dana Turner. This presented an issue of credibility, the decision on which is explicitly made the province of the bankruptcy court judge. Fed.R.Bankr.P. 8013. Obviously, the bankruptcy court resolved the credibility issue in favor of Dana Turner. Therefore, the bankruptcy court's finding that the evidence does not support JRS' counterclaim for abuse of process was not clearly erroneous.

Accordingly, the judgment of the bankruptcy court is AFFIRMED.

So ORDERED.