583 F.2d 542
 Fed. Sec. L. Rep. P 96,532
Elizabeth D. HOLMES and Industrial National Bank of Rhode
Island, as Executors of the Estate of Howard W.
Holmes, Plaintiffs-Appellees,
v.
Harold BATESON and Gordon Bronson, Individually and Under
the Trade Name andStyle of Charles A. Maguire and
Associates, and C. E. Maguire, Inc.
andCombustion Engineering,
Inc., Defendants-Appellants.
 Nos. 77-1484 to 77-1486.
 United States Court of Appeals,
First Circuit.
 Argued March 8, 1978.
Decided Aug. 11, 1978.
As Amended Aug. 28, 1978.
 
 W. Foster Wollen, New York City, with whom Thomas M. Geisler, Jr., Shearman & Sterling, New York City, Joseph V. Cavanagh and Higgins, Cavanagh & Cooney, Providence, R. I., were on brief, for appellant C. E. Maguire, Inc.
 Gerald Gillerman, Boston, Mass., with whom Jill W. Landsberg, Widett, Widett, Slater & Goldman, P. C., Paul M. Siskind, John M. Reed, Jeremiah F. Healy, III, Withington, Cross, Park & Groden, Boston, Mass., George M. Vetter, Hinckley, Allen, Salisbury & Parsons, and G. Chandler Beals, Providence, R. I., were on brief, for appellants Harold Bateson and Gordon Bronson.
 Bernard Bressler, New York City, with whom Alan D. Plotkin, Bressler, Lipsitz & Rothenberg, New York City, Richard M. Borod and Edwards & Angell, Providence, R. I., were on brief, for appellees.
 Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.
 BOWNES, Circuit Judge.
 
 
 1
 This appeal arises from claims brought under the Securities Exchange Act of 1934, section 10(b), 15 U.S.C. § 78j(b), and Securities Exchange Commission Rule 10b-5, to obtain compensatory damages for the sales of securities allegedly induced by appellants in violation of the Act and the rules promulgated pursuant to it.[1] An action for fraud was also brought under Rhode Island law. Specifically, it was alleged that appellants "willfully participated in a scheme and plan and in acts and practices designed to communicate false and misleading information about the condition, status, affairs and prospects of the (Maguire) Corporation and Partnership so as to cause the sale by plaintiffs of the Holmes shares of the Corporation . . . ." Appellants contend that the district court's misinterpretation of financial statements coupled with a misunderstanding of the underlying transactions resulted in clearly erroneous findings. They also contend that the action was barred by the statute of limitations. Appellant Maguire Corporation appeals a finding of corporate liability based on the actions of its former principals, Gordon Bronson and Harold Bateson. The amount of damages assessed by the district court is contested by all appellants.
 
 
 2
 The district court found that the estate of Howard W. Holmes had been defrauded of over two million dollars by the action of defendants Bateson and Bronson and Maguire corporation. Most of the underlying facts are undisputed, though they are characterized differently and the differences between the inferences drawn from them are vast.
 
 THE FACTS
 A. The Cast
 
 3
 Charles A. Maguire and Associates, an engineering firm headquartered in Providence, Rhode Island, since 1942, was operated as a partnership for most of its existence. In the spring of 1968, it was conducted by four partners: Milton E. Nelson, Holmes, Bronson, and Bateson.[2] Holmes joined the firm in 1950 and became a partner in 1952. Bronson joined Maguire in 1953 and became a partner in 1960. Bateson also became a partner in 1960. Ralph Neff was employed as Maguire's accountant since 1944. John Coffey was employed as Maguire's attorney since the late 1940's and visited Maguire almost every working day. Coffey was a close friend of the Holmeses and represented Mrs. Holmes after her husband died. The Industrial National Bank of Rhode Island was Maguire's principal lender and the institution chosen by Holmes to administer his estate. Henry F. Tingley, Jr. was in charge of the bank's commercial loan department and responsible for the Maguire account. He had been familiar with the Maguire operations since the late 1940's. Evandro Radoccia, an attorney and head of the bank's Estate Settlement Division, was appointed to act on the bank's behalf as co-executor with Mrs. Elizabeth Holmes. Edward Long and Kenneth Rawlinson of the bank's Trust Department were also involved at different times on the bank's behalf in its capacity as co-executor. Mrs. Holmes was co-executor of the estate, but she relied completely on the advice of Coffey whom she had known since childhood. She had not been involved in the business during her husband's life. Maguire, Bateson, and Bronson were represented by Attorney Robert Picard in matters dealing with Holmes's estate since Coffey represented the estate.
 
 B. Formation of the Corporation
 
 4
 Maguire was principally engaged in the design and construction supervision of highways, bridges, and sanitary projects and providing related consulting services. In 1967, the business experienced growing pains, and the partners retained the management consultant firm of Booz, Allen and Hamilton (Booz, Allen) to analyze the firm's organizational problems and make recommendations for its future operation. The partners and Coffey received a report from Booz, Allen in December, 1967.
 
 
 5
 The report described a healthy and rapidly expanding firm whose financial reporting and accounting method were inadequate to reflect its true earnings. One of the primary criticisms was the company's use of cash basis accounting which, because it did not match fees earned with expenses incurred, was particularly inappropriate for a service organization such as Maguire. The bank was also unhappy with the cash basis accounting method.
 
 
 6
 In the spring of 1968, based largely on recommendations contained in the Booz, Allen report, a decision was made to incorporate, effective January 1, 1969. The partnership was retained to facilitate liquidating the assets in a tax advantageous manner. The corporation was to complete pending contracts and to conduct all new business after December 31, 1968. Accounts receivable, retainages, and rights to payment for work performed before December 31, 1968, were retained by the partnership. The Maguire partners were to individually transfer their interests in certain partnership assets to the corporation in December 31, 1968, in exchange for the issuance of 850 shares of common stock: 350 shares for Holmes and 250 each for Bateson and Bronson. The partnership assets transferred included the right to perform new contracts and complete work in progress. Cash receipts were to be collected by the partnership and would be reportable as personal income for the partners.
 
 
 7
 The three shareholders of the corporation filed an election under Subchapter S of the Internal Revenue Code so that the tax attributes of the corporation would be reportable on their individual tax returns. This allowed the partners to offset their income with the expenses incurred by the corporation. The partners also transferred cash receipts from the partnership to the corporation as loans to the corporation from the individual partners in proportion to their interests in the corporation. This was the principal mechanism by which the corporation obtained working capital. Since the partnership was dependent on accounts receivable for its supply of cash, the funds were transferred as received rather than in one lump sum. Neff, the accountant, was in charge of this procedure.
 
 
 8
 Holmes's active participation in the business declined, due to an addiction to alcohol, prior to his death on April 9, 1969. There is no evidence that he actively participated in or had knowledge of any of the merger or acquisition attempts.
 
 C. Merger and Estate Settlement Activities
 
 9
 In February, 1969, Bronson contacted Michael Cantor, a broker for companies seeking merger or acquisition. Cantor put Bronson in touch with the Barry Wright Corporation. Coffey was called in to help negotiate Cantor's fees.
 
 
 10
 On March 26, 1969, at the end of the first quarter of the corporation's operation, the first annual meeting was held.[3] Coffey, Picard, Holmes, Bronson and Bateson were present. Cash basis profits of $498,000 were reported by Bronson as Treasurer, and Coffey, prepared a press release which indicated that the company had gross receipts of 6.6 million dollars, an increase of approximately 15% Over the previous year. Despite the company's profitability, it had cash flow problems as a result of its rapid growth and because expenses were incurred and payable long before accounts could be billed.
 
 
 11
 At the March meeting, Bronson also reported that a final settlement had been reached with former partner Nelson. Nelson was to receive $400,000 for his 26% Interest in the partnership. Coffey advised the stockholders that, since they had now formed a corporation, they should agree on some method of determining the value of the stock in the event of death. Holmes, Bateson, and Bronson agreed, according to Coffey, "that should anything happen to any one of them, until such agreement was entered into, that the determination of the value of the deceased or withdrawing or discharged partner would be as if they were still a partnership." There was a buy out provision in the partnership agreement specifically providing the method and time period for payment of a deceased partner's share of the business.[4]
 
 
 12
 When Holmes died on April 9, 1969, he owned a 46% Interest in the partnership and 350 shares, or 41.7% Of the corporation's capital stock. He had loaned the corporation a total of $244,000. After Holmes's death, Bateson became President of Maguire, and he and Bronson became the sole directors.
 
 
 13
 There is little doubt that Coffey, Bronson, and Bateson all acted under the impression that the remaining partners would buy the estate's interest in Maguire, both the partnership and the corporation, as if the business were still a partnership. Coffey's understanding was that the estate's interest would be bought out by Bronson and Bateson, and that the price would be determined on the basis of the book value of the partnership and corporation as of March 31, 1969, less a 20% Discount.[5] This was the formula actually used by the parties in arriving at a settlement.
 
 
 14
 From the date of Holmes's death until the estate was settled on January 6, 1970, Bateson and Bronson received regular monthly cash statements for both the partnership and the corporation within three weeks of the end of each month. Monthly statements of accounts receivables were also prepared during this period. Bronson met regularly with the accountant, Neff, and both Bateson and Bronson met regularly with the divisional vice-presidents to review accounts receivable and work in progress. None of this information was ever shared with the estate or its representatives.
 
 
 15
 On April 16, 1969, Coffey, Bateson, Bronson, and Neff reported to Tingley (the loan officer) that the bank had been named coexecutor of the estate and that the company's obligation to the estate would be in the vicinity of $600,000 to $700,000.[6] On April 24, 1969, Coffey met with Radoccia and Long of the Trust Department and told them that there was a preexisting arrangement between the partners of Maguire that would provide for buying out a partner's share. Present at the meeting were Mrs. Holmes, Coffey, Radoccia, Bronson, Bateson, Picard, and Neff. Coffey explained the tax effects of the Subchapter S status of the corporation to Radoccia, told him that the company had a growth rate of ten to fifteen percent, grossed over six million dollars in 1968, and had cash flow problems which were reflected in difficulty meeting bills. Coffey also told Radoccia that, as of December 31, 1968, Holmes's share of Maguire was worth at least $650,000. They discussed previous pay outs to partners and the formula by which they had been calculated. Picard testified that he explained, for the benefit of Radoccia and Mrs. Holmes, that the corporation had been formed to facilitate acquisition or merger. At this point, there is no evidence that any of the parties appreciated the complications created by the corporate structure and the application of the Securities and Exchange Act to the sale and purchase of the shares of Maguire stock held by the estate.
 
 
 16
 After Holmes's death and before the first estate meeting on July 24, 1969, Bronson met with representatives of Barry Wright on at least four occasions, and Bateson met with Barry Wright representatives at least once to discuss acquisition. Bronson had periodic telephone contact with Barry Wright's president and supplied Barry Wright with partnership financial data covering a ten year period, which Barry Wright converted into accrual data as a part of its analysis which was completed on or before July 8, 1969.
 
 
 17
 Bateson, Bronson, Coffey, Mrs. Holmes, and Radoccia attended the first estate meeting on July 24, 1969. No financial information was given to the estate at that time, nor was any information concerning merger negotiations revealed.
 
 
 18
 Sometime between the first estate meeting and the second on September 24, 1969, Bateson and Bronson met with a representative of Science Management Corporation to discuss merger or acquisition possibilities.
 
 
 19
 Bronson and Bateson continued to meet with representatives of Barry Wright throughout the summer of 1969. On August 5, 1969, they conferred with its president. On August 14, Bronson prepared, on the corporation's stationery, a memorandum outlining the terms for acquisition by Barry Wright of Maguire's stock. The outline matched the terms embodied in a handwritten memorandum prepared by Barry Wright's president, I. e., purchase of Maguire to be paid for by 140,000 shares of Barry Wright stock. Exhibit 62. Bronson's memorandum contained the following legend: "There is one copy of each of these memoranda in my personal file no others exist and needless to say, please keep these (Sic ) data under lock and key." No copy of this memorandum was ever furnished to the estate; nor was it informed of the meetings with Science Management or Barry Wright.
 
 
 20
 Bateson and Bronson also wrote memos to each other concerning their own estimates of the company's net worth which they valued at between six and seven million dollars. Exhibits 28-32. These were never disclosed to representatives of the estate.
 
 
 21
 By September 3, 1969, all divisions of the corporation had delivered job completion information as of June 30, 1969, to Bronson. Although this material was all that was necessary for the preparation of accrual reports to that date, the company's accountant was told to work on other items and no reports were prepared.
 
 
 22
 On September 11, 1969, Bateson prepared a memorandum which projected earnings of $900,000 on an accrual basis for 1969 and valued the corporation at $5,800,000 on a cash basis, and $7,500,000 on an accrual basis. This memorandum included comparisons of the selling prices of other corporations and a statement that "it appears that we are worth something in excess of $6,000,000." (emphasis original). Bateson sent this memorandum to Bronson; the estate never received a copy. Exhibit 28.
 
 
 23
 At the September 24, 1969, meeting, Neff provided the estate representatives with a statement of the revised net worth of the combined Maguire entities as of March 31, 1969, and a certified financial statement of the partnership for the year ending December 31, 1968. Radoccia testified that he read these statements.
 
 
 24
 During an early October visit to Combustion Engineering, Inc., (Combustion) on other business, Bronson discussed with Kiamie, Vice-President and Controller of Combustion, the possibility of Combustion's acquiring Maguire. Kiamie put him in touch with James Thornton of the Lummus Company, a wholly owned subsidiary of Combustion, who proceeded to gather information on Maguire. Bateson and Bronson also spent the entire day of October 8, 1969, reviewing merger and acquisition possibilities with representatives of Science Management. On October 17, Bronson met with representatives of Barry Wright to discuss acquisition of Maguire, and, on October 20, he prepared a memorandum comparing the relative advantages of acquisition by Barry Wright and Science Management and projections of the corporation's earnings on an accrual basis from 1969 to 1972. Bronson noted: "(T)he opportunities for growth appreciation with the right merger can mean much more in compensation and security (than the sales price), particularly as we become the nucleus of a very broad based acquisition program." Exhibit 30. Neither this memorandum nor the Science Management visit were disclosed to any of the estate representatives at this time or at the October 28, 1969, estate meeting.
 
 
 25
 Radoccia consulted with Rawlinson (a bank trust officer) about the potential tax benefits to the estate from the corporation's cash losses, and, on October 28, 1969, Radoccia met with Mrs. Holmes, Coffey, Bronson, Picard, and Neff. They discussed the corporation's operating loss and its availability to the estate for tax purposes. At this meeting, the parties arrived at $825,000 as the approximate sum that was due the estate for its interest in the combined entities. Neff derived the figure by calculating Holmes's share of the total book value of the corporation and partnership as of March 1, 1969, and deducting a 20% Discount, even though the accounts had been collected.[7] The actual figure determined at a subsequent meeting on November 3 was $815,000. Coffey testified that this figure was strictly in conformance with the partnership agreement and that he was unaware that the accounts had been collected when the discount was applied. No mention is made of any discount in the partnership agreement. Picard testified that the estate's interest was computed as though the partnership and corporation were a single entity.
 
 
 26
 On October 28, 1969, after the estate meeting of that date, Bronson told Picard that when he had been in California working with Combustion, it had expressed interest in exploring the possibility of acquiring Maguire. Picard testified:
 
 
 27
 I told him that I thought under all the circumstances, they ought to complete their transaction with the estate, which was already almost a fact, that if he entered into negotiations, I thought it should be reported to the Estate representatives, because I said there is an obligation to make a disclosure with respect to material facts of that sort, when a purchase or sale of capital stock is involved.
 
 
 28
 Tr. 885. It is important to note that Picard's advice was given while he was unaware of the Barry Wright and Science Management discussions.
 
 
 29
 On November 26, 1969, the parties met to execute a formal agreement to the effect that the business owed the estate $815,000. A determination of the allocation between the partnership and the corporation was not made.
 
 
 30
 On December 8, 1969, Bronson wrote to Tingley (the loan officer), with a copy to Coffey, stating that, on December 15, 1969, Maguire would "have our nine month accruals" which would "provide a meaningful measure of realistic performance." Exhibit CCC. These statements for the nine months ending September 30, 1969, were delivered to the bank on December 15, and supplementary material was delivered on the 18th. Exhibits 32 & 52. They revealed an accrued profit before taxes of $720,000 for the nine months. These statements were not disclosed to any of the representatives of the estate unless the bank's loan officer is considered such a representative.
 
 
 31
 Bronson wrote to Radoccia setting up a meeting for January 6, 1970, Exhibit 48, to execute the final estate settlement documents, and telephoned Kiamie the next day in order to set up a meeting to discuss the possibility of Combustion's acquisition of Maguire which was scheduled for January 7. At the closing on January 6, 1970, Bateson, Bronson, Picard, Radoccia, Mrs. Holmes, Coffey, and Neff were present. Neff produced a sheet showing the allocation of the amounts due from the corporation and the partnership of the agreed payment of $815,000. Exhibit 15. The breakdown shows corporate liability for capital stock in the amount of $4,453.62 and for notes payable to Holmes or his estate in the amount of $577,150 for a total of $581,603.62. Payment was to be made in seven annual installments of $83,086 without interest. The balance of $233,397 (815,000 minus $581,603) was due from the partnership. Neff also provided the parties with a summary of distributive shares of the estimated corporate loss. Exhibit 16. The estimated cash loss of $1,300,000 for the corporation was the net corporate operating loss that was available to the parties for tax purposes as a result of the Subchapter S election. Neff did not produce the accrual statements which had just been sent to Tingley, and, indeed, he had not seen them himself.[8]
 
 D. The Acquisition by Combustion
 
 32
 Bateson and Bronson met with Kiamie and Kelly, another officer of Combustion, on January 7, 1970, as had been previously arranged. Bronson showed Kiamie the accrual statements for the first three quarters of 1969, and they discussed the terms of the agreement reached with the estate. During the meeting, Kelly stated that Combustion would offer Bronson and Bateson in the vicinity of $6,000,000 worth of stock for the corporation and partnership. A tentative agreement was reduced to writing on January 12, 1970. Exhibit 49. On January 9, 1970, Bronson wrote to the President of Barry Wright to explain his and Bateson's decision to join Combustion. The letter said: "We could not discuss anything until after January 6, 1970, and we were not able to gauge the seriousness of indication on their (Combustion's) part until we had a meeting with them." Exhibit 43.
 
 
 33
 On February 2, 1970, Picard delivered to Radoccia two pages to be substituted for the first two pages of the Corporate Purchase Agreement between Maguire and the estate of January 6, 1970. The substituted pages provided that the entire $581,603.62 which the corporation agreed to pay the estate was in consideration for the 350 shares of common stock rather than reflecting the $577,150 which had been loaned to the corporation by Holmes and the estate as specified in the first agreement. Exhibit 4. Although the record provides no explanation for the substitution, the effect is a capitalization of the money loaned by Holmes and the estate to the partnership. This coincides with the capitalization of the money loaned by Bateson and Bronson. A fair inference is that this was done to facilitate Combustion's acquisition of Maguire. There is no evidence in the record that Mrs. Holmes ever agreed to the substitution.
 
 
 34
 Bronson and Picard met with Kiamie on February 17, 1970, at which time the corporate acquisition was revised, and the partnership acquisition eliminated from the agreement. On February 20, 1970, Radoccia wrote to Bronson requesting that quarterly financial statements be sent to him since the estate was now a creditor of the business. Exhibit RR. In response, Bronson sent an Estimated Statement of Net Worth and Income Statements as of December 31, 1969, combined and also broken down between the partnership and the corporation and prepared on both a cash basis and an accrual basis. Exhibit SS. The material showed gross corporate income, on an accrual basis, of $7,800,000 and a net profit, again on an accrual basis, of $908,809 before taxes.[9]
 
 
 35
 The tentative acquisition agreement was amended on March 3, 1970, to provide that Combustion would transfer to Bateson and Bronson, in exchange for their Maguire stock, a total of 24,240 shares of Combustion's common stock as an initial payment and 24,000 shares on a contingent, earn out basis. A final agreement to this effect was executed on April 29, 1970. Exhibit 17. At the same time, Bateson and Bronson entered into employment agreements with Combustion. Maguire was to retain in its treasury the 350 shares of stock formerly belonging to the estate.
 
 
 36
 In August of 1970, the noninterest bearing note from the corporation in the sum of $581,603.62, representing the balance due the estate, was cancelled by the immediate payment of $417,000. Bronson initiated the transaction by a letter to Coffey, with a copy to Radoccia, stating that $417,000, in Combustion's judgment, was the present value of the seven $83,086 annual payments that Maguire was obligated to make. The estate accepted this offer, and, on August 6, 1970, Mrs. Holmes, Radoccia, and the Maguire corporation executed an agreement stating that the executors accepted the $417,000 in full satisfaction of the corporation's note. Exhibit A.[10]
 
 
 37
 Coffey first learned of the impending sale to Combustion in January or February of 1970. The only action he took with regard to the sale was to certify the corporation's by-laws. Coffey testified that, as late as 1971, Bateson said that he got little out of the transaction with Combustion and that the "real money would come from the earnout." Bronson and Bateson informed the bank of the sale on March 6, 1970, and the bank's trust committee chairman wrote a congratulatory letter to Combustion aimed towards soliciting continued business.
 
 LIABILITY AS TO BATESON AND BRONSON
 
 38
 " Section 10(b) of the 1934 (Securities Exchange) Act and Rule 10b-5 prohibit the use of any manipulative or deceptive device or contrivance in the sale of securities." Cook v. Avien, Inc., 573 F.2d 685, 692 (1st Cir. 1978). The traditional elements of a 10b-5 action are scienter,[11] material omissions and/or misrepresentations, reliance, and due care by the plaintiff. The Supreme Court in Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), eliminated negligence as a cause of action in a 10b-5 securities case, but left open the question of whether reckless conduct would suffice to ground a claim.
 
 
 39
 The district court found that this case was "primarily one of nondisclosure" and that the defendants had failed to reveal to the estate accrual figures reflecting the true value of the business and the details of the negotiations for the acquisition of the business by Barry Wright, Science Management, and Combustion. Although the court concluded that all of the above omissions were "material," it clearly placed greatest emphasis on the failure to reveal the merger information. In addition to the omission of material facts, and as a secondary basis for liability, the court found that defendants had made deliberate misrepresentations to the estate as to the condition of the business. Finally, the court held that plaintiffs had established sufficient scienter on the part of defendants and reliance and due care on their own part to succeed in their suit.
 
 
 40
 Appellants do not appear to question any of the legal standards applied by the district court in arriving at its holding. But they rigorously contest the district court's finding of scienter, materiality, affirmative misrepresentation and reliance. We shall discuss each in turn. The court's finding of due care on the part of plaintiffs is not discussed in appellants' brief and, therefore, that issue is before us only tangentially.
 
 Scienter
 
 41
 There is no dispute that, if the district court was correct in finding that the "evidence . . . demonstrates a pattern of intentional deception on the part of the individual defendants," 434 F.Supp. 1382 the Supreme Court's scienter requirement as set out in Ernst & Ernst v. Hochfelder, supra, would be satisfied. However, appellants argue that the court seriously misinterpreted and mischaracterized the evidence, which, they contend, if viewed in its correct light, would not sustain a finding of intent to deceive. Thus the issues as to scienter[12] are basically questions of fact and must be resolved in favor of affirming the district court's findings, unless shown to be clearly erroneous. United States v. United States Gypsum,333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1947). Fed.R.Civ.P. 52(a). A factual finding is clearly erroneous when it is against the clear weight of the evidence. Barbe v. Drummond, 507 F.2d 794, 797 (1st Cir. 1974). This is so whether the evidence reviewed is primarily documentary or comprised of testimony subject to the court's findings of credibility and reliability. Local Union 1219 v. United Bro. Corporation, 493 F.2d 93, 96 (1st Cir. 1974). A finding will be found "erroneous" and require reversal only if we are " 'left with the definitive and firm conviction that a mistake has been committed.' " Evans v. United States, 319 F.2d 751, 753 (1st Cir. 1963).
 
 A. The Accrual Information
 
 42
 Appellants claim that the accrual information was divulged to the estate representatives because it was carried on the face of the "Revised Estimated Net Worth of the Partnership and the Corporation of March 31, 1969." Exhibit 15. Bateson and Bronson contend that, by reading the December 31, 1968, partnership statement, Exhibit 17, in conjunction with the March 31, 1969, combined partnership and corporation statements, one can determine the cash basis partnership profit for the three months ending March 31, 1969. They argue that the accrual basis profits for the corporation, the partnership cash basis profit, and the corporation cash basis loss can all be found in these statements.[13]
 
 
 43
 If one possesses a high decree of accounting skill and is thoroughly familiar with the structure of the partnership and the corporation, the accrual figures can, after effort, be determined from the statement, but we cannot say that the statements display the accrual profit of the corporation in any readily understandable fashion. The March 31, 1969, statement is misleading, to say the least, in the light of the very large cash basis loss and the absence of any explanatory note. Bronson testified that, on September 24, 1969, the date when this information was delivered to the estate representatives, he did not know that it contained accrual information. If Bronson did disclose the accrual information, then he did so unknowingly, and the impact of this disclosure on the court's finding of scienter would be minimal. If Bronson did not know from reading the statement that it contained the accrual information, which he now contends that it does, the estate certainly could not be faulted for failing to dig deep enough to uncover it.
 
 
 44
 Appellants contend that the financial statements delivered to the estate at the time of closing showed that the corporate cash basis loss of $1,330,000 was exceeded by the partnership cash basis profit of $1,831,175 for the year, with a net profit of $501,175. Exhibit 16. Appellees do not quarrel with this submission, and it is true as far as it goes. The problem is not in the information itself, but in the inferences and values which appellants assign to the net profit of $501,175.
 
 
 45
 First, appellants contend that this information shows clearly that the corporate cash loss should not have been construed as evidence of serious financial troubles as the district court found. Second, they argue that the district court could only have found that the cash loss was evidence of financial trouble because it failed to understand the relationship between the partnership and the corporation and that the combined net profit of the two was more important than the corporate cash loss. They further contend that their reading and interpretation of the financial statements would be "evident to any reader" and that "no sophisticated analysis of financial statements is required."
 
 
 46
 We do not think that the district court was unable to comprehend the relationship between the partnership and the corporation. An indication of a loss, on either a cash or accrual basis, is evidence, at least at first blush, more of financial trouble than of a profitable operation. While the combined figures do show a profit, it was only $500,000, before taxes; accrual data would have shown a far greater profit with earnings in the vicinity of a million dollars, so that the cash basis figures are misleading and incomplete.
 
 
 47
 It is of even more importance that the figures revealing a cash basis profit would be of little significance to a sophisticated appraiser. More pertinent indications of value would have been the work in progress, the contracts still to be fulfilled, and the amounts to be billed and collected for this work. These so-called "unrecorded" assets and liabilities are of far greater importance in predicting a corporation's performance in the future than a cash basis profit figure.[14] An accurate accrual statement would have portrayed a rosy future for the corporation. But without any accrual figures and without any knowledge of the acquisition activity, the future of the business could reasonably have been interpreted to be bleak. Such a forecast would be reinforced by the indications of extreme cash flow problems of which Bronson complained.
 
 
 48
 Appellants next contend that the district court erred in finding that Bronson concealed the nine month accrual statement because it had, in fact, been delivered to Tingley. Tingley was not an estate representative; he was a loan officer of the bank and was not necessarily aware of the specific factors that had to be evaluated by the estate. The obligation of the corporation was to report to the estate's representatives. The disclosure to Tingley was not made to furnish the estate with information about the business but because of the bank's independent concern as a creditor of the corporation.[15]
 
 
 49
 Appellants' contention that they effectively disclosed this information to Coffey, as a representative of the estate, has more merit, but it still falls short of what was required. Coffey was sent a copy of the letter to Tingley which stated that the accrual report was ready. The letter does not state whether the copy was sent to Coffey in his capacity as estate representative or as the corporation's counsel. Because it concerned dealing with the bank as a creditor, we can only assume that the letter was sent to him in his capacity as corporate counsel, particularly since Coffey was not an executor, but only estate counsel, and since all other communications by Bronson and Bateson to the estate were made to Radoccia. We are constrained to add that Coffey's representation of both the corporation and the estate, despite his attempt to isolate estate matters from corporate matters, did not show good judgment. See ABA Canons of Professional Ethics, No. 5. Because both parties to this suit were aware of his dual representation and retained him not only despite it, but because of it, we only comment that an independent attorney's reliance on Bateson's and Bronson's honesty might well have been more tempered. In any event, when the corporation chose to communicate with the estate, it directed those communications to Mrs. Holmes as well as Radoccia and Coffey, not to Tingley and Coffey.
 
 
 50
 The nine month accrual statements which were given to Tingley on December 15, 1969, and the supplemental statements sent to him on December 18, contain income and expense statements and balance sheets on both a cash and an accrual basis. They completely and accurately show the company's performance and disclose the financial data which an intelligent investor-stockholder would need in order to determine the value and potential of the business. No reason is given for appellants' failure to disclose this information directly to the estate, which they had available and obviously considered important.
 
 
 51
 Bronson's testimony indicated a recognition of the separation between the trust and commercial departments of the bank. He testified that the accrual statements had been prepared for "the commercial section of the Industrial National Bank," and when asked whether there was any accrual information supplied to the estate in addition to the March 31, 1969, statement, he replied: "Not to my knowledge." When asked whether he had supplied a copy of the accrual "statement to any estate representatives prior to January 6, 1970 . . .," he replied in the negative. Bronson further testified that he never told anyone representing the estate that the corporation was enjoying a profitable operation if measured on an accrual basis. In light of this testimony and the other evidence, the district court's findings of selective disclosure and material omissions were not clearly erroneous.
 
 
 52
 B. The Price Paid the Estate for Maguire's Stock
 
 
 53
 Appellants' second contention with respect to the underlying facts is that the district court's finding that the estate sold all of its stock in the Maguire corporation for $4,453 is clearly erroneous and that the finding so obscured the court's view of the other evidence that this one error prejudiced all of the other factual findings. Appellants argue that the estate sold all of its interest in the Maguire business for $815,000, and that the figure cannot be broken down into separate parts.
 
 
 54
 Based as it was on the characterization of payments made by the parties in the settlement contract, before pages were substituted without Mrs. Holmes' knowledge, we cannot say that the finding is clearly erroneous. In fact, it appears to be clearly correct. Holmes and the estate advanced $577,150 to the Maguire corporation as working capital in the form of a loan. This figure was in proportion to Holmes's share of the stock and was matched by loans from Bateson and Bronson of $412,250 each in proportion to their shares of stock. When the $815,000 which the business owed the estate was apportioned between the partnership and the corporation, the corporation's share was $581,603.62. The balance was due from the partnership and was based on the contemporary cash value of the partnership. Of the $581,603.62, $577,150 was money loaned to the corporation. The balance of $4,453 was what was paid for the stock. Even after the pages of the agreement were changed to provide that the loaned money would be capitalized as a contribution to capital, the estate received the same amount of money; $577,150 represented the amount advanced to the company as working capital, and the only sum received by the estate for the Maguire corporation as a going business was $4,453.62. By comparison, Combustion's payment to Bronson and Bateson was made with full knowledge of the corporate debt and reflected the value put on the business over and above whatever had been paid to the estate. In reviewing damages, however, we are aware that uniform treatment must be given to the loans, or paid in equity, made by the three owners. We discuss this Infra.
 
 C. The Misrepresentations
 
 55
 We turn now to the question of whether the district court was clearly erroneous in its finding that "Bronson painted a black picture and made negative remarks and that they contributed to the estate's misapprehension of Maguire's true financial condition." Mrs. Holmes testified in cross-examination: "Mr. Bronson did speak at that meeting about the situation of the company; that it was in very poor shape; they were having a difficult time; and went on at great length that the Company was in the pits so to speak. I mean it was not doing well."[16] Appellants argue that the actual remarks were addressed only to a cash flow situation, and stress that the only testimony with regard to Bronson's remarks was that of Mrs. Holmes, who admittedly did not know much about the financial affairs of the company. The determination of the weight and credibility of the evidence is entirely up to the district court. Moreover, we point out that Coffey also testified that he was sure that Maguire was in extreme financial difficulty. He stated that the close working conditions between himself and the principals of Maguire left him certain that they were making all necessary disclosures and that he was sure of their accuracy. Yet, Coffey was never made aware of the offer of Barry Wright or of the serious negotiations between Maguire and other firms concerning acquisition or merger and he testified that he was not involved in the financial affairs of the company. The district court gave great weight to Coffey's testimony, which, of course, was entirely within its province.
 
 
 56
 The evidence which appellants adduced to show that Maguire was in a cash bind, but not in any financial danger, does nothing to disprove the finding that a black picture was presented. On the contrary, it could be interpreted to demonstrate how appellants created the illusion of serious financial difficulties while actually enjoying remarkable success.
 
 
 57
 D. The Partnership Agreement and Oral Understanding
 
 
 58
 In addition to the evidence as to accrual omissions and misrepresentations as to the corporation condition, there remains the most damaging evidence of all, defendants' failure to disclose their ongoing merger negotiations which revealed to them that the business in its corporate form was far more valuable than the estate's buy out price would indicate. No disclosure of merger information occurred even after his own attorney, Robert Picard, advised Bronson of securities law requirements in this area.[17] To explain these omissions, appellants argue that they acted in good faith reliance on their understanding that the partnership agreement's survivorship " buy out" provisions carried over to the new corporate form.
 
 
 59
 There is no doubt that the three owners of the business had an oral understanding, after forming the corporation, that, if anything happened to any one of them before a written agreement was executed providing for a method of determining the value of the stock of the new corporation, the determination of the deceased's interest in the business could be computed according to the buy out provisions of the partnership agreement. The oral understanding was not reduced to writing and appellants agree that it did not constitute a binding agreement as the court below ruled.[18] It is Bateson's and Bronson's position, however, that they acted in good faith, in accord with the partnership agreement, even if mistaken as to its effect, and, therefore, had no intention to deceive. The state of mind of appellants, of course, goes to the core of the issue of scienter, but claimed good faith reliance on the partnership agreement is only one indication of scienter. The entire course of conduct of Bateson and Bronson was properly scrutinized by the district court. We point out that if the partnership agreement controlled, as Bateson and Bronson claim they thought, there would have been no reason for only a partial disclosure of the financial situation and silence as to the merger activities. Furthermore, under the partnership buy out provisions, the parties could arrive at any other arrangement that was considered fair.[19] So, even if the partnership agreement were in effect, there was no hard and fast formula as to the deceased partner's share. We also observe that the 20 percent discount applied to the estate's share of the business was not a provision of the partnership buy out agreement.
 
 
 60
 The exact intent of the parties in agreeing on a survivorship arrangement must remain obscure. It is difficult to believe that partners who have just incorporated their business, among other reasons, to promote its merger or acquisition potential, would at the same time agree to an absolute and inflexible survivorship agreement which completely ignored the market value of their corporate stock. The district court was not clearly erroneous in inferring that the existence of this nonbinding agreement could not satisfactorily explain the policy of secrecy and omission perpetrated by the defendants.
 
 
 61
 There are two securities fraud cases in which the question and effect of an agreement is the central issue, Rochez Brothers, Inc. v. Rhoades, 491 F.2d 402 (3d Cir. 1973), and Saint Louis Union Trust Company v. Merrill Lynch, Etc., 562 F.2d 1040 (8th Cir. 1977). Appellants contend that our case falls between Rochez Bros. and Saint Louis Union which implicitly suggests that Rochez Bros. is distinguishable. We find it on point in important respects. In Rochez Bros., two stockholders who owned all of the outstanding stock of a corporation between them had both business and personal difficulties. Rochez made an offer to sell his stock to Rhoades. Rochez knew that Rhoades had valued a one-half interest in the corporation to an outsider at 1.75 million dollars and considered the valuation too high; Rochez initiated the transaction between himself and Rhoades and set out very specific terms and a timetable. When he set the price, he stated that he did not care where Rhoades got the money and assumed that Rhoades had outside investors waiting in the wings. The sale price set by Rochez was $598,000. Rhoades, shortly after acquiring the company, sold it for $4,250,000, plus stock in the acquiring company, based on negotiations begun before Rochez had sold out. The material information which it was found that Rhoades failed to disclose prior to the sale was that he had hired a "finder" to look for and arrange for an acquisition, and that negotiations were under way. Id. at 406-409.
 
 
 62
 In the present case, it is arguable that the disclosure that a "finder" was retained was made to Coffey. But Coffey also could be found to have been under the impression that the reason for searching for an acquiring corporation was that Maguire was in trouble. Appellants point out that in Rochez, there was no prior and continuing understanding between the parties. While it is true that the Rochez agreement was not of long standing, it was definitely binding. The offer to sell was made with full knowledge of the corporation's financial situation, except for the extent of acquisition negotiations already underway; otherwise, the facts are strikingly similar to the case at bar. There was no binding agreement in this case and, to the extent that there was an understanding, it was followed by the estate representatives because they operated under a misconception of the actual state of financial affairs as did Rochez.
 
 
 63
 Saint Louis Union is a different situation. In that case, there was a valid written agreement made at the time of the stock acquisition for repurchase upon death. The sale was triggered by this agreement and was in no way based upon any knowledge or misconception of the plaintiffs. In the instant case, there was no agreement in effect at the time the corporation was formed and the subsequent understanding to use the partnership as a basis for determining value was made without knowledge of material facts and under the misapprehension that the corporation was in desperate straits.
 
 E. Conclusion
 
 64
 Given the totality of the facts examined above and the other evidence of scienter noted in the district court's opinion, 434 F.Supp. at 1382, and in the lengthy statement of facts in this opinion, we cannot say that the district court's holding of scienter was erroneous.
 
 Materiality and Reliance
 
 65
 The test for determining the "materiality" of the nondisclosure is " whether 'a reasonable man would attach importance (to the fact not disclosed) in determining his choice of action in the transaction in question.' " Rogen v. Illikon Corp., 361 F.2d 260, 266 (1st Cir. 1966), quoting Restatement, Torts § 538(2)(a); See Rochez Brothers, Inc. v. Rhoades, 491 F.2d 402, 408 (3d Cir. 1974), Cert. denied, 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976); List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir.), Cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); Kohler v. Kohler Co., 319 F.2d 634 (7th Cir. 1963). Both List and Kohler "describe as 'material' those facts about a corporation's business 'which in reasonable and objective contemplation might affect the value of the corporation's stock or securities * * * ' " Rogen, supra, 361 F.2d at 266, quoting List, supra, 340 F.2d at 462, and Kohler, supra, 319 F.2d at 642. The Supreme Court has stated the test most recently in TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976):[20] "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important . . . ."
 
 
 66
 The question of whether reliance is required in a 10b-5 case as to omissions was discussed in Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). The Supreme Court held that reliance was not a prerequisite to recovery in a case involving material omissions, reasoning:
 
 
 67
 Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.
 
 
 68
 (Citations omitted). Id. at 153-154, 92 S.Ct. at 1472.
 
 
 69
 Since the illegal conduct here was primarily that of nondisclosure and the holding of liability could be affirmed on that ground alone, the issue of reliance is not central to the resolution of this case. Positive proof of reliance on omissions is not necessary where materiality has been established. Affiliated Ute Citizens v. United States, supra, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741; Dupuy v. Dupuy, 551 F.2d 1005, 1015 (5th Cir.), Cert. denied, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). Appellants do not contend that the district court failed to apply the correct standard on this issue, but argue that the court erred in finding that the omissions were material in that plaintiffs were indifferent to the merger information and would not have acted differently if they had received full disclosure of the negotiations. We are not persuaded.
 
 
 70
 We find it inconceivable that a reasonable stockholder would not think that the merger information concealed in this case was important and, therefore, material. We think the evidence supports the district court's conclusion that the reason the estate's representatives did not express more interest in possible merger options before the closing was that they believed they had received all the information then available. The close relationship between the parties undoubtedly also acted to lull their suspicions.
 
 
 71
 We find little merit in defendants' contention that the district court's finding of materiality was clearly erroneous because of substantial errors in its assessment of the total mix of information made to the estate. As we have indicated, we think that the district court correctly analyzed the entire picture and its findings of material omissions and selective disclosures were based on the fact that the information given to the estate was purposely incomplete and inaccurate.
 
 
 72
 The district court based its finding of scienter on omissions and affirmative misrepresentations. Materiality and reliance (causation) followed as a common sense predicate to the proposition that, if the estate had known of the merger negotiations and the true financial condition of Maguire, it would not have sold its stock for the price it did. The findings of the district court leading to its ultimate conclusion of fraud were not clearly erroneous. Affiliated Ute Citizens v. United States, supra, 406 U.S. at 128, 92 S.Ct. 1456, established that only the materiality of omissions must be proven, reliance is no longer a factor. There was sufficient evidence here of material omissions to render the misrepresentations superfluous.
 
 
 73
 As to actual reliance on misrepresentations and selective disclosure, appellants contend that the estate representatives never believed that the cash loss figures for 1969 represented losses indicative of serious financial trouble, and that the contrary findings of the district court were clearly erroneous. They point to Coffey's awareness that the Booz, Allen report had criticized the cash basis accounting and argue that Coffey and Radoccia knew that the corporation was expected to have cash losses during the transitional period of 1969. They point to facts showing that the estate representatives expected to use the losses on the estate's tax returns as a result of the Subchapter S election. This argument overlooks the fact that the district court was entitled to rely on the testimony of Coffey and Mrs. Holmes that they were led to believe that the corporation was experiencing financial difficulty.
 
 
 74
 Appellants also argue that the estate's post-transaction conduct clearly establishes that they were not misled by cash losses. They base this contention on Radoccia's receiving accurate accrual information shortly After the closing. We agree with appellants that this document, which Radoccia had requested as a creditor of the corporation in order to monitor the condition of the corporation, should have made him aware of the possibility that the estate had been shortchanged. Exhibit SS. The information, however, was not received until after the sale of the stock and, therefore, does nothing to disprove the findings of the district court that misleading, cash basis information was selectively disclosed and that accrual information was withheld. Radoccia's response or lack of response to receiving the accrual information after the closing does not by itself compel the conclusion that he was aware of the information earlier or would have ignored it had he received it before the buy out was completed.
 
 
 75
 Appellants further argue that Coffey was aware of the continued growth of the corporation or, at least, the business. Coffey testified that, since the corporation had lost Holmes, it was really without a head. The district court's crediting this testimony was not a clearly erroneous determination of Coffey's knowledge and state of mind.
 
 
 76
 Appellants' argument that the district court's finding of reliance on omitted material facts is rebutted by evidence that the estate's representatives were totally disinterested in the possibility of acquisition or merger and that had they known that acquisition was imminent, they would not have acted differently begs the central question. The reason the estate representatives were totally disinterested is that they were unaware of what was going on.
 
 
 77
 The district court found that there had been direct proof of reliance on defendants' affirmative misrepresentations. We cannot help but note that this reliance was tempered by a considerably less than forceful representation of the estate's interest when the estate's counsel and executor met with the defendants. However, whatever faults or negligence may be attributed to the estate in its dealing with the defendants, plaintiffs demonstrated sufficient reliance and due care to sustain a finding of intentional violations of the Securities Act. See Dupuy v. Dupuy, supra, 551 F.2d at 1013-1020.[21]
 
 
 78
 Because we affirm the district court as to the liability of Bateson and Bronson under the Securities and Exchange Act, it is unnecessary to determine if they are also liable under Rhode Island law.
 
 LIABILITY OF MAGUIRE CORPORATION
 
 79
 The next issue is whether the Maguire corporation should be held jointly liable with Bateson and Bronson. The district court found that the corporation operated through its officers and directors in perpetrating the fraud and directly benefited from it by purchasing the estate stock at an undervalued price. Liability was predicated under 10b-5.
 
 
 80
 The Corporation negotiated with the Estate for the purchase of said stock through its agents Bateson and Bronson. Throughout the negotiation period Bateson was the Corporation's President and one of its two Directors; Bronson was the Corporation's Executive Vice-President and Treasurer and its other Director.
 
 
 81
 Holmes v. Bateson, supra, 434 F.Supp. at 1383. The district court also found Bateson and Bronson liable as controlling persons under section 20(a) of the Act, 15 U.S.C. § 78t(a).[22]
 
 
 82
 Maguire's basic contention is that, after the time it was used as a tool by Bateson and Bronson, the corporation acquired new owners who were not privy to the fraud and it is unjust that they are the ones who have to pay the piper, since they were not wrongdoers. It relies on Rochez Brothers, Inc. v. Rhoades, 527 F.2d 880 (3d Cir. 1975),[23] and Thomas v. Duralite Company, 524 F.2d 577 (3d Cir. 1975), as precedent for its position. These cases are inapposite because neither involved a situation in which a corporate defendant directly purchased the stock in question.[24] In both cases, the plaintiff sought to place secondary liability on the corporation. Here, the corporation was found liable under 10b-5; secondary liability was quite properly imposed under section 20(a) of the Act on the individuals who orchestrated the fraud.
 
 
 83
 One of the cornerstones of corporate law is that a corporation is responsible for the acts and omissions of its agents, officers, and employees acting under the corporate manner. While a corporation does have an immortal existence, it can conduct its affairs only through its officers and employees. Cyr v. B. Offen & Co., Inc., 501 F.2d 1145 (1st Cir. 1974).
 
 
 84
 Maguire would have us reject traditional corporate liability theory and fashion a new one to the effect that, where a corporation is used as an instrumentality for fraud by its officers and directors, the subsequent purchase of the corporation from the wrongdoers should insulate the corporation from liability. This overlooks the fact that one of the essential attributes of a corporation is its continuing existence as an entity despite changes in control and ownership. The standard procedure for new owners seeking to avoid liability for past corporate misdeeds is to buy the assets and liabilities of the corporation, not its stock. Such an approach in this instance, of course, would not have met the needs of either Combustion or Maguire. The corporation may, of course, have a right of indemnification from the malfeasors, but it cannot escape its primary liability to the party defrauded. In discussing the liability of a successor corporation in a 10b-5 case, the Eighth Circuit stated:
 
 
 85
 The fact that bona fide public stockholders might indirectly be prejudiced by the corporation's payment of indebtedness incurred by a predecessor corporation is not persuasive. Stockholders are presumed to invest with knowledge of proper corporate liabilities. If any harm exists by reason of the corporation's legal liabilities wrongfully caused by its officers or directors, such damage can be corrected through proper proceedings.
 
 
 86
 Myzel v. Fields, 386 F.2d 718, 749 (8th Cir. 1967), Cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1965). We note that Combustion had a right of indemnification, at least at one time, against Bateson and Bronson, which was included in the agreement to purchase Bateson's and Bronson's stock. Exhibit 17.
 
 
 87
 We affirm the holding of the district court as to the liability of the corporation.
 
 THE STATUTE OF LIMITATIONS
 
 88
 Section 10b-5 of the Securities Act of 1934 has no statutorily prescribed limitations. Cook v. Avien, Inc., supra, 573 F.2d 685. We, therefore, turn to state law to determine what period should apply. Rhode Island has three different statutes of limitations that might conceivably apply: six years, one year, and three years.[25] We apply federal common law to determine when the action accrued, and rule that whatever state statute applies, it did not run while the fraud remained concealed, but began to run when the accrual statements were revealed to Radoccia in February of 1970. We reject the district court's pre-Cook v. Avien, Inc., ruling that the statute did not begin to run until plaintiff's counsel revealed the fraud to Mrs. Holmes in February of 1972. Cook v. Avien, Inc., supra, requires that plaintiffs pursue their rights diligently upon being put on notice of the omissions and/or misrepresentations. Here, Radoccia was supplied with accrual information in February of 1970, which disclosed the probability that Maguire was a vibrant, healthy enterprise instead of a failing business as Radoccia formerly had been led to believe.
 
 
 89
 Appellants contest the district court's finding that Rhode Island's six year general statute of limitations applies and argue that its one year statute for oral "words spoken" should apply. Their contention is that whatever misrepresentations were made, were oral. We do not agree. A very large part of the misrepresentations in this case involved material omissions and the selective disclosure of written documents. The cash basis financial statements alone take the case out of the one year "words spoken" statute. Neither party has suggested that Rhode Island's three year statute of limitations for personal injuries should apply, although, in a securities case arising in Massachusetts, we found that state's two year statute for personal injuries applicable. See Janigan v. Taylor, 344 F.2d 781, 783 (1st Cir.), Cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965). Since the complaint was filed in March of 1972 and the statute of limitations was triggered in February of 1970, well within the three year period, we need not decide whether the district court's ruling that the six year statute applied was correct.
 
 DAMAGES
 
 90
 None of the parties quarrel with the district court's basic method for computation of damages in a securities fraud case, and we find that the proper rule was applied. The district court ruled that
 
 
 91
 the measure of damages is the difference between the fair value of what the seller received and the fair value of what he would have received in the absence of fraudulent conduct . . . except that when the defendant gains more than the seller's loss, damages are that portion of the defendant's profits as are not due to the defendant's own special efforts after the fraud occurred.
 
 
 92
 Holmes v. Bateson, supra, 434 F.Supp. at 1388. See Affiliated Ute Citizens, supra, 406 U.S. at 155, 92 S.Ct. 1456; Myzel v. Fields, supra, 386 F.2d at 748; Janigan v. Taylor, supra, 344 F.2d at 786.
 
 
 93
 The court found that the corporation had a value of $6,000,000. It based this finding mainly on the testimony of plaintiffs' expert, Professor Hunt, whose valuation was primarily based on a price-earnings basis formula for industrial corporations applied to the corporation's 1969 earnings.
 
 
 94
 Professor Hunt's valuation was based on the following considerations and rationale.[26] He testified that the primary element in his determination of the value of a corporation "is the future funds flow which the company offers to its owners." That is
 
 
 95
 obtained partially by using the history of the company to see the trends and partly by studying other elements to predict (the) future course of it's (Sic ) funds flow and earnings, and equal importance is given to the price earnings ratio as an indication of . . . the investment world's evaluation of this type of risk.
 
 
 96
 Hunt testified that, except for banks and insurance companies, book value is almost never one of the factors used in determining the true value of a corporation, particularly with a service company such as Maguire.
 
 
 97
 Professor Hunt then described the specific factors he considered in evaluating the worth of the corporation to its owners as of January 6, 1970.
 
 
 98
 I made a brief review of the balance sheet as of December 31, 1969, to assure myself that the company was not in current financial difficulties. I then made a considerable study of the record of its (Sic ) earnings, converting the reported earnings, which were on a cash basis, to an accrual basis. I then evaluated the recent figures earned on an accrual basis by the use of a price earnings ratio.
 
 
 99
 Hunt was unable to secure reliable information of price earnings ratios for comparable companies from the New York Stock Exchange and, therefore, used the price earnings ratios of industrial companies prepared by Standard & Poors. Exhibit 100. From September, 1969, to April, 1970, these price earnings ratios ranged from 15 to a maximum of 16.81. Hunt concluded that Maguire was worth $6,000,000 "based on a range calculated by me from the estimated after tax earnings of the corporation in 1969, and the application of the price earnings ratio." He explained:
 
 
 100
 I first selected the figure, 15, for January, 1970, (the minimum price earnings ratio during the period considered) multiplied the after tax earnings, estimated at $481,000 to get $7,215,000, and then because the Maguire company was a small, closely held operation, I marked down the price earnings ratio to ten, and attended (Sic ) the number $4,810,000.
 
 
 101
 Since these represented the extreme of a range, he chose the average figure which was almost exactly $6,000,000.
 
 
 102
 Appellants contend that the Hunt method was incorrect and assert that when there is a sale of stock on the open market which is contemporaneous with the transaction under consideration or very near to it, the price is the best evidence of the value of the stock. The market value is generally recognized as the best evidence when it is available and reliable. Mills v. Electric Auto-Lite Co., 552 F.2d 1239, 1247 (7th Cir.), Cert. denied, 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977); Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 516 F.2d 172, 185 (2d Cir. 1975), Rev'd on other grounds 425 U.S. 910, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1977). In this case, however, the market value of Combustion's stock was not a reliable measure of Maguire's value as a going business for several reasons. In the first place, this was a closed deal; it was not a sale on the open market. There was no battle for control in a free market as was the situation in Chris-Craft. Secondly, since the stock involved in the acquisition was unregistered, it could not be sold on the open market. Appellants' expert, in using the market value approach, applied a 30% Discount to the market value of registered Combustion stock because of this restriction. The testimony of Kaufman, appellants' expert, makes it clear that the value of the stock obtained by Maguire from Combustion could not be determined by a simple reference to the Wall Street Journal. Thirdly, and perhaps of most significance, is the fact that the market value of the Combustion stock listed on the New York Stock Exchange has no bearing at all on the value of the earn out stock. Appellants would ignore this stock altogether on the grounds that its value is only speculative. Professor Hunt on cross-examination put a value of $653,039 on it, but Bateson and Bronson expected to gain a great deal more than that by obtaining additional shares and by an increase in its value due to an aggressive acquisition program. The employment contracts of Bateson and Bronson must also be considered along with the earn out stock as some indicia of value.
 
 
 103
 An additional distinction between this case and Chris-Craft and Auto Lite is that appellants, here, seek to evaluate Maguire's worth not through the market value of its own stock, but based on the market value of the stock of the acquiring company. Such a method, whatever its merits under other circumstances, cannot be applied here where the bargain which was struck resulted from private negotiations and the valuation reached was so far out of line from both an expert's evaluation and the value which the owner-operators placed on the company after a detailed analysis. The sellers here had already rejected an offer much higher than the market value of Combustion's stock, and the record shows no changes in the economic circumstances which would justify a reduction in the value of Maguire as a going business. These were good reasons for the district court's taking into consideration "a number of factors," including "the companys history and management, its operating expenses and earnings, the book value and adjusted book value of its shares, the selling price of its stock and its profit trends." Holmes v. Bateson, supra, 434 F.Supp. at 1388.[27]
 
 
 104
 The Supreme Court rejected contemporary sales prices as a means for valuation of stock where, for different reasons, the prices were deemed unreliable in Affiliated Ute Citizens, supra, 406 U.S. at 155, 92 S.Ct. 1456, at 1473. It reasoned that "reasonable inferences may be drawn and the District Court, as the trier of fact on this record, is not restricted to actual sales prices in a market so isolated and so thin as this one." Here, though the market for Combustion's stock was not thin or isolated, the determination of the value of Maguire's stock demanded a more sophisticated approach than the simple application of a price index to the shares of Combustion's stock.
 
 
 105
 One of the factors to be considered in determining the value of Maguire as a going business is what Bateson and Bronson themselves thought it was worth. As pointed out, Supra, two of their confidential memos valued the business at "something in excess of $6,000,000." As the district court noted, Professor Hunt's "evaluation is consistent with that of Bateson and Bronson reached in September, 1969, and with that of McGill (an officer of Barry Wright) who felt that the rejected tentative offer of $4,800,000 by Barry Wright was much too low." Holmes v. Bateson, supra, 434 F.Supp. at 1388.
 
 
 106
 The district court's reliance on the expert testimony of Professor Hunt, which more than adequately supported its findings, was exclusively within its province. See Evans v. United States, supra, 319 F.2d 755. We hold that the district court's assessment of damages was not clearly erroneous except as hereinafter discussed.
 
 
 107
 One factor, which was not touched upon by any party, is the disparity in treatment given to the money which was owed by Maguire to the estate and the money owed by Maguire to Bateson and Bronson. The money advanced by Holmes and the estate to Maguire was properly treated as a debt by the district court in making its determination of the value received by the estate for its stock. In computing damages, the money advanced by Bateson and Bronson must be treated in the same fashion. Since the money advanced was later capitalized, the district court and the parties neglected to differentiate it from the value of the corporation. As a result, the computation included monies advanced by Bateson and Bronson and capitalized, but excluded the sums so advanced by Holmes and the estate. Contributions to capital must be deducted from the $6,000,000 value of the corporation before damages can properly be assessed. These contributions totalled $824,500, comprised of two advances of $412,250 made by each of the two officers. The $6,000,000 figure is, therefore, reduced to $5,175,500. When this figure is multiplied by the estate's share of the corporate stock (41.6%), the result is $2,153,424. From this must be deducted the $4,453.62 already paid to the estate for its stock, leaving a remainder of $2,148,554.38 instead of the district court's figure of $2,465,746.38.[28]
 
 
 108
 Finally, appellants challenge the district court's application of a prejudgment interest rate from January 6, 1970. They tacitly acknowledged that this was within the district court's discretion, but complain that it was unfair and unjust. Chapter 9-21, Section 9-21-10 of the General Laws of Rhode Island provides:
 
 
 109
 In any civil action in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages, interest at the rate of eight per cent (8%) per annum thereon from the date The cause of action accrued which shall be included in the judgment entered therein. (emphasis added).
 
 
 110
 The district court's finding that the imposition of said interest would be fair and equitable under the circumstances if this case does not appear to us to be either unfair or unjust. Appellants have had the benefit of their fraud for over eight years and an interest rate of 8% Today is not unduly high.
 
 
 111
 Affirmed in part and reversed in part and remanded for recalculation of interest and judgment in accord with this opinion.
 
 
 
 [1]
 The district court's opinion is Holmes v. Bateson, 434 F.Supp. 1365 (D.R.I.1977)
 Rule 10b-5 provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
 (1) to employ any device, scheme, or artifice to defraud,
 (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 in connection with the purchase or sale of any security.
 
 
 [2]
 Except for the terms of his sellout arrangement, Nelson has no further importance to this case
 
 
 [3]
 The district court erred in finding that this meeting took place on March 25, 1969. Holmes v. Bateson, supra, 434 F.Supp. at 1372
 
 
 [4]
 The buy out agreement also provided: "Nothing herein contained, however, shall prevent the remaining partners from entering into any other mutually satisfactory arrangement or agreement with the estate of the deceased relative to the amount or method of payment of the amount due to or from the estate of any deceased partner." Exhibit M
 
 
 [5]
 Presumably, although not stated, the discount was to cover shrinkage in the accounts receivable and costs of collections
 
 
 [6]
 Tingley was in charge of the Maguire account; the evidence is that he was not cognizant of what went on in the Estate or Trust Departments of the bank
 
 
 [7]
 A deceased partner's share consisted of his capital account, his share of partnership receivables, and his share of work in progress. Neff's handwritten calculations, part of Exhibit 15 and Radoccia's notes from the November 3 meeting, Exhibit 96, explain how the calculation was made. Neff took the unrecorded net worth of the partnership, $1,489,000 as of March 31, 1969, deducted 20%, multiplied the remainder by Holmes's share of the partnership, 46%, and added to the product Holmes's capital account in the partnership, $51,000, and Holmes's cash transfers to the corporation of $244,000. This gave a total of $843,000. He then took the book value of Holmes's interest in the corporation and added to it the total. The book value shown on the March 31 statement is a deficit of $396,366.41 (unrecorded net worth of $1,041,543.97 less the recorded cash loss of $909,726.32 and the reserve for taxes of $539,000). There was an adjustment by which the cash loss was reduced to $816,707.32, the tax reserve was reduced to $269,500, and a deficit net worth of $44,693.55 was found and rounded off to a deficit of $45,000. Holmes's share in the corporation, 41%, was multiplied by this number with a result of $18,450 resulting in a final figure of $824,500. Later adjustments brought the figure to $815,000
 $1,489,000 $1,489,000
 -298,000 x .20
---------- ----------
$1,191,000 $ 298,000($297,800)
 x .46
----------
$ 548,000($547,860)
$ 548,000 $ (45,000)
 51,000 x .41
 ----------
 244,000 $ (18,450)
----------
$ 843,000
 -18,450
----------
$ 824,550
 
 
 [8]
 The letter to Tingley does not indicate that a copy was sent to Neff
 
 
 [9]
 We consider this the point at which the statute of limitations began to run. See Cook v. Avien, Inc., 573 F.2d 685 (1st Cir. 1978), discussion, Infra
 
 
 [10]
 Mrs. Coffey testified: "So then I called Radoccia and talked with him about (discounting the note) . . . . And it wasn't actually explained to me just what this discounting meant, but Mr. Radoccia very definitely said, 'I feel this company is on very shaky ground, and instead of waiting seven years you would be a lot safer to take the discount and take the money now.' " Tr. A-54
 
 
 [11]
 We define scienter as the Supreme Court did in Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976): "In this opinion the term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud."
 
 
 [12]
 Our evaluation of the district court's findings of fact will serve a double purpose. In addition to contributing to the court's conclusion as to scienter, several of these findings pertain to the omissions and misrepresentations which form the core of plaintiffs' allegations of wrongdoing. We, therefore, review those findings from two perspectives: whether the alleged omission or misrepresentation occurred and its relevance in establishing scienter
 
 
 [13]
 Appellants also contend that the necessary accrual information was contained with respect to the partnership in the audited Pro forma balance sheets and statements of income and expenses for the Maguire partnership as of December 31, 1968, when the notes to the statements are read. The district court found no 10b-5 violations with respect to the partnership. To the extent that the partnership information has relevance to that of the corporation, we have taken the statements prepared for the partnership into account
 
 
 [14]
 Moreover, defendants had already been informed in unmistakable terms by the Booz, Allen report that cash basis accounting was not an effective means to represent the true financial condition of the business
 
 
 [15]
 The argument made by appellants with respect to Industrial Trust Co. v. Dean, 67 R.I. 504, 25 A.2d 552 (1942), that knowledge of one department of a bank can be imputed to other departments of a bank is inappropriate in a situation where a bank is not a creditor of the estate. That case stands for the proposition that where a bank occupies adversary positions as both creditor and executor, the paramount duty of the bank is owed to the estate. In that case, the issue was whether the bank had breached its fiduciary duty by serving as executor of an estate of which it was a creditor and dealing for both itself and the estate. If any analogy were to be drawn from that case to this one, it would be whether the bank had violated its fiduciary duty to the estate by serving both the corporation and the estate, since the two were in an adversary position. Maguire's post hoc rationalization that the information which it gave to Tingley, a loan officer, should have been filtered through the bank's bureaucracy to Radoccia, an estate representative, assumes that Tingley would be sufficiently aware of defendants' omissions to have reason to believe that Maguire would not have already given the information to Radoccia
 Reliance on Kossover v. Willimantic Trust Co., 122 Conn. 166, 187 A. 907 (1936), is likewise misplaced. The service of garnishee process upon the bank, in a manner prescribed by law, was deemed sufficient to charge the bank with the constructive notice knowledge of the debts. Similarly, In re Carter, 511 F.2d 1203 (9th Cir. 1975), concluded that a bank, which after being put on notice that the letter announcing foreclosure had not been received, was liable because it did not take commercially reasonable steps to notify the debtor, despite opportunity to do so.
 Appellants' argument that Tingley knew that Coffey looked to him to act in the best interest of the estate and bank as executor finds no support in the record.
 
 
 [16]
 The court mistakenly found that the remarks were made at the September 24, 1969, meeting. The record makes it clear that Mrs. Holmes was testifying as to what Bronson said at the July 24 meeting
 
 
 [17]
 Page 549, Supra
 
 
 [18]
 Article 8-319 of the Uniform Commercial Code requires a writing before a contract for the sale of securities will be enforceable. R.I.Gen.Laws § 6A-8-319
 
 
 [19]
 Supra at 547 n.4
 
 
 [20]
 This test was stated in the context of a case based on a misleading proxy statement under the SEC's Rule 14a-9, but it has equal applicability here. In Mills v. Electric Auto-Lite, 396 U.S. 375, 384, 90 S.Ct. 616, 621, 24 L.Ed.2d 593 (1970), the Court addressed the element of materiality in an earlier action based on Rule 14a-9: "(T)he defect . . . (must be) of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote." See Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 63-64, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975); J. I. Case v. Borak, 377 U.S. 426, 431, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964)
 
 
 [21]
 We are aware that Ernst & Ernst v. Hochfelder, supra, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668, by eliminating a cause of action premised on negligence in 10b-5 cases has forced a reexamination of the standard of due care as applied to a plaintiff. In Dupuy, the Fifth Circuit made an exhaustive analysis of the standard of due care in the light of Ernst & Ernst. It concluded that: "Because the private 10b-5 cause of action derives from a prohibitory SEC rule, the standard of conduct for defendants logically should be the same whether the SEC or a private litigant enforces the duty." It held that a plaintiff was not barred by ordinary negligence, but could not recover in a scienter case based on misrepresentations if he was reckless. See also Holdsworth v. Strong, 545 F.2d 687, 692 (10th Cir. 1976). We do not now have the occasion to rule on the standard of care required in a 10b-5 scienter case based solely on affirmative misrepresentations, but note that Dupuy's holding eliminating ordinary negligence as a defense seems to be a reasonable extension of our own holding in Rogen v. Illikon Corp., supra, 361 F.2d at 267-268, in the light of the new standards now required by Ernst & Ernst
 
 
 [22]
 15 U.S.C. § 78t. Liabilities of controlling persons
 (a) Every person who, directly or indirectly controls any person liable under any provision of this title (15 U.S.C. §§ 78a Et seq.) or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
 
 
 [23]
 This is not the same Rochez Bros. case cited, Supra, 491 F.2d 402, but a related one
 
 
 [24]
 Indeed, a part of the district court opinion that was not reviewed in Thomas v. Duralite Company, 524 F.2d 577 (3d Cir. 1975), affirming in part and reversing in part, D.C., 386 F.Supp. 698, specifically held that plaintiffs were entitled to impute the fraud of the directors and officers to the corporation which Did effect a purchase of stock. 386 F.Supp. at 726
 
 
 [25]
 The Rhode Island statutes are as follows:
 General Laws 1956 (1969 Reenactment)
 § 9-1-13. Limitation of actions generally. Except as otherwise specially provided, all civil actions shall be commenced within six (6) years next after the cause of action shall accrue, and not after.
 General Laws 1956 (1969 Reenactment)
 § 9-1-14. Limitation of actions for words spoken or personal injuries. Actions for words spoken shall be commenced and sued within one (1) year next after the words spoken, and not after. Actions for injuries to the person shall be commenced and sued within three (3) years next after the cause of action shall accrue, and not after.
 In February of 1970 (the time at which we have found the cause of action arose), G.L.1956 (1969 Reenactment) § 9-1-14 read in pertinent part:
 "(a)ctions for injuries to the person shall be commenced and sued within two (2) years next after the cause of action shall accrue, and not after."
 General Laws 1956 (1969 Reenactment) § 9-1-14 was amended by P.L.1971, ch. 200, § 1, to extend the personal injuries statute of limitations from two to three years. It was further amended by P.L.1973, ch. 162, § 1, to apply retroactively to "those actions which had accrued less than two years prior to August 1, 1971."
 
 
 [26]
 The professor is a member of the Harvard Business School Faculty, holder of the Edmund Cogswell Converse Chair in Finance and Banking, Emeritus, and also a professor in accounting and finance at the University of Massachusetts. His fields of specialty are corporate finance and financial accounting
 
 
 [27]
 This approach has been used in a number of cases. See, e. g., Hicks v. United States, 486 F.2d 325 (10th Cir. 1973), Cert. denied, 416 U.S. 938, 94 S.Ct. 1939, 40 L.Ed.2d 289 (1974); Rothgery v. United States, 475 F.2d 591, 594, 201 Ct.Cl. 183 (1973); Righter v. United States, 439 F.2d 1204, 194 Ct.Cl. 400 (1971); Worthen v. United States, 192 F.Supp. 727 (D.Mass.1961)
 
 
 [28]
 Since the terms of the loans from Bateson and Bronson are not in evidence, we have treated them at full value rather than discounting them as was done when the estate's loan was paid